**In re WCC HOLDING CORPORATION, World Cycle Corporation, Spoke World, Inc., Debtors.**

**Duke SALISBURY, Chapter 7 Trustee for the Estates of WCC Holding Corporation and World Cycle Corporation, Plaintiff,**

v.

**TEXAS COMMERCE BANK–HOUSTON, N.A., Defendant.**

Bankruptcy Nos. 390–35242–HCA–7 to 390–35244–HCA–7.
Adv. No. 392–3723.

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

Sept. 9, 1994.

Alan W. Harris, Andrews & Kurth, L.L.P., Dallas, TX, William E. Junell, Jr., Andrews & Kurth, L.L.P., Houston, TX, for Texas Commerce Bank–Houston, N.A.

Jay L. Gueck, Gueck Davis Seeberger & Siegel, Dallas, TX, for Duke Salisbury, Chapter 7 Trustee.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAROLD C. ABRAMSON, Bankruptcy Judge.

This adversary proceeding is an action to recover an allegedly fraudulent transfer of a security interest in the assets of the Debtors to Texas Commerce Bank–Houston, N.A. ("TCB") and to equitably subordinate TCB's claim. These Findings of Fact and Conclusions of Law are entered after a full evidentiary trial before the Court.

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A), –(H), –(K), and –(O).

### Findings of Fact

*The SWI/WCC Transaction*

1. In 1979, Michael Spratt ("Spratt") founded a retail bicycle chain, Spoke World, Inc. ("SWI") and commenced operations at two locations. Over the next eight years, SWI expanded to 41 stores with locations throughout Texas (in Austin, Houston, San Antonio, and Dallas), Georgia, and Colorado.

2. SWI's historical annual inventory turnover was about 1.2. The inventory turns were lower than the industry average because SWI purchased large quantities at discounts.

3. SWI's average historical gross profit margin was 45%.

4. In late 1987, Stewart Masterson ("Masterson"), a Houston entrepreneur interested in the bike retailing business, approached Spratt about acquiring his business. Masterson and Spratt began negotiating the terms of purchase. Masterson was given access to SWI's business and financial information to evaluate the prospect of buying SWI stores.

5. To facilitate the purchase, Masterson established a corporation, Gilbert Goodwin, Inc. Masterson later changed its name to World Cycle Corporation ("WCC"). WCC was to be the purchasing entity.

6. Masterson hired the accounting firm of Arthur Andersen & Co. ("Andersen") to inspect SWI's business and to review SWI's financial information. After completing its purchase investigation, Andersen reported that SWI's gross profit margin was 45%, its 1986 net profit was $556,889, and its 1987 net profit was $1,082,304. Andersen also confirmed SWI's other financial data to be as reported by SWI, including sales and expense data. Masterson compiled Andersen's findings, together with his own due diligence, in an Offering Memorandum that he submitted to the Houston investment banking firm of Duncan, Cook & Co. ("Duncan Cook"). This firm was to assist Masterson in obtaining equity investors and bank financing.

7. The SWI historical financial information has not been questioned by the Trustee, and there have been no complaints lodged against Andersen's purchase investigation.

8. John H. Duncan, Sr., his brother Charles W. Duncan, Jr., and Stephen Cook were principals of Duncan Cook. Charles W. Duncan, III ("Carlos"), who is Charles' son, was a Duncan Cook employee. Duncan Cook used the Offering Memorandum to solicit investors who, along with Masterson, committed to invest $1 million in the purchase transaction and related venture. Duncan Cook also contacted numerous banks, including TCB, and showed them the Offering Memorandum to attract debt financing.

9. On February 19, 1988, TCB received the Offering Memorandum and a request from Duncan Cook to provide a term loan and a revolving line of credit to finance the purchase transaction and to provide a working capital base. Loren Jensen, a TCB loan officer, was given responsibility for administering this request. Kirk Sweet, Jensen's supervisor, was also involved.

10. After conducting numerous discussions with the principals involved in the proposed transaction; visiting the SWI stores to observe their operations; reviewing the SWI historical data, industry information, and Andersen verification; and running various financial projections, TCB decided to make the requested loans. Jensen prepared a presentation to TCB's Loan and Discount Committee on March 14, 1988. On the basis of this presentation the Committee approved the loan and gave it a grade of 6, which was a common grade for a loan of this type at origination.

11. On March 21, 1988, WCC and SWI entered into an Asset Purchase Agreement ("APA") under which WCC agreed to buy and SWI agreed to sell 40 of SWI's 41 bicycle stores together with all inventory and other assets associated with the operation of those 40 stores. In consideration for a total payment of $1,056,000 (50% to be paid at closing and 50% to be paid in one year), SWI and Spratt agreed in the APA that they would not compete with WCC for a two-year period in any region within 10 miles from an existing WCC store or from any new WCC store opened during the two-year period. If WCC failed to make the second $528,000 payment, the obligations under the noncompete clause could cease. WCC agreed to pay SWI cash in the amount of $4,157,000 at closing and $500,000 payable in three yearly installments of $167,000, and WCC agreed to assume $1,999,678 of SWI's approximate $2.5 million existing trade payables. However, the creditors did not release SWI from the obligation to pay this debt. The trade creditors, therefore, had both SWI and WCC to look to for payment of their debt. The acquisition closed on April 20, 1988 and was effective as of April 18, 1988.

12. To fund its asset purchase, WCC received $1 million in contributed capital from three groups of investors, one group led by

Duncan Cook ($455,000), one group led by Spratt ($295,000), and another group led by Masterson ($250,000). WCC Holding Corporation ("WHC"), which was established as WCC's parent, issued 1 million shares of common stock to the investors commensurate with their respective capital contributions. WCC also obtained a $2.5 million term loan from TCB, all of which was to be used to purchase SWI's assets. The term loan was to be repaid on the following schedule: $100,-000 due December 31, 1988; $400,000 due in 1989 in four quarterly installments of $100,-000; the same for 1990; $475,000 due in 1991, with one quarterly payment of $100,000 and three quarterly payments of $125,000; $500,000 due in 1992, with four quarterly payments of $125,000; the same in 1993; and one payment of $125,000 due in 1994.

13. WCC also obtained a $2.0 million revolving line of credit from TCB, $875,000 of which was used by WCC to pay closing expenses and to purchase SWI's assets. To secure repayment of both the term loan and revolver, TCB obtained a security interest in the assets WCC acquired from SWI. TCB also received a pledge of WHC's stock interest in WCC. TCB obtained a warrant to acquire 30,000 shares (or approximately 3%) of WHC stock. TCB never exercised its warrant and never became a shareholder of WCC or WHC. The terms of the loan are reflected in the loan agreement and the attachments thereto.

14. On April 18, 1988, the parties understood that the loans provided by TCB were intended to finance WCC's 40-store company. WCC hoped to expand to a 200-store company in five to seven years. On the date of the loan, a formal expansion strategy had not been discussed or resolved by the company. It was contemplated that expansion could be accomplished by franchising, issuance of new stock, purchases of existing stores, and new store openings. The parties understood that additional debt and/or equity financing would be needed to accomplish these expansion goals. The company intended to keep expansion to a minimum in its first year, with a maximum of five new stores. TCB relied on these company representations regarding expansion in its lending decision.

15. Before deciding to fund the WCC loan, TCB compiled projections of WCC's future cash flow to pay its debts. There were six sets of projections prepared, each containing various assumptions regarding sales, gross profit margin, expenses, capital expenditures, interest rate, and inventory turns. The company case assumed a 4% growth in store sales each year, continuation of SWI's historic 45% gross margin, and 4% annual growth in expenses. The low case assumed no sales growth, 45% gross profit margin, an increase in expenses to 33% of gross sales, annual inventory turnover of 1.2 (which was well below the 2.98 industry average), and capital expenditures of $100,000 to $200,000 per year. Given the circumstances and the knowledge of the parties on April 20, 1988, the assumptions made were reasonable, and the projections fairly and reasonably predicted that WCC had adequate assets to give it the ability to produce operating revenue sufficient to pay its debts as they became due in its normal operating cycle.

16. Following the acquisition, WHC's initial board of directors consisted of John Duncan, Carlos Duncan, Spratt, and Masterson. John Duncan also was a member of TCB's board. Spratt was appointed as WHC's chairman of the board. He was also elected as WCC's CEO. Masterson was elected as WCC's president. Steve Moon, a former SWI employee, became the company's chief financial officer, and David Luxem, also a former SWI employee, became vice president of operations. Spratt was in control of the company's day-to-day operations and directed the company's expansion.

17. Arthur Andersen was hired by WCC to prepare its opening day balance sheet. In July 1988, Andersen issued the following balance sheet of WCC as of April 18, 1988:

### Assets

| | |
|---|---|
| Cash | $ 45,112 |
| Inventory | 3,999,677 |
| Prepaid expenses | 111,939 |
| Total current assets | 4,156,728 |

| | |
|---|---|
| Property and equipment | 1,505,950 |
| Noncompete agreement | 1,050,000 |
| Trade names | 515,000 |
| Organization costs | 353,751 |
| Total assets | $7,581,429 |

### Liabilities and Equity

| | |
|---|---|
| Current maturities of long-term debt | $ 366,667 |
| Accounts payable | 1,999,678 |
| Noncompete agreement | 528,000 |
| Accrued liabilities | 148,751 |
| Total current liabilities | 3,043,096 |
| Long-term debt | 3,508,333 |
| Equity | 1,030,000 |
| Total liabilities and equity | $7,581,429 |

18. Andersen observed and determined that WCC's fixed assets were worth $1,505,950. No other appraisal of WCC's fixed assets on the date of the loan was offered by the Trustee.

19. Andersen appraised WCC's trade names and trademarks at $515,000 and its noncompete agreement at $1,050,000. Andersen issued an appraisal letter setting forth its valuation analysis with respect to WCC's trade names and noncompete agreement.

20. Following the transaction, WCC possessed a $1.125 million working capital line of credit with TCB and had additional working capital of $1.113 million. This working capital was sufficient for its projected needs.

21. It was the purchasing group's stated goal to improve inventory control procedures, including the implementation of a perpetual inventory system. Masterson's efforts during the first year failed to yield a functional system. In the following year, WCC purchased software for a perpetual inventory system. This system also failed.

22. Entering the transaction, Masterson, et al., thought WCC had the potential to become a 200-store chain in five to seven years. The plan was to expand through merger and by acquiring competing stores by offering the owners stock in WCC, the theory being that those stores could operate more profitably under the WCC umbrella and thereby increase the former owners' wealth. The board of directors also envisioned using the company's available cash flow from operations to open new stores, just as SWI had done over the last nine years. The board of directors recognized that the feasibility of opening new stores each year would need to be closely analyzed. Masterson and the other investors represented to TCB that expansion would be kept to a minimum in the first year and that expansion costs would be paid from the company's available cash flow and by purchasing existing stores with stock offerings. On April 20, 1988, TCB could not have reasonably foreseen that WCC would expand to 98 stores in 15 months.

*WCC Operations*

23. Sometime after the acquisition, WCC accelerated its business plan. Contrary to its original representation that it would open only a few stores in the first year, WCC embarked upon a rapid expansion program. In September 1988, WCC opened 10 new stores in Phoenix and Tucson, Arizona. From November 1988 through February 1989, WCC opened 24 new stores in Florida. In March 1989, WCC added another store in Dallas, and between April 1989 and July 1989, it opened two new stores in New Mexico and 10 more stores in Florida, and it bought 10 existing stores in the Fort Worth area from Odis Harris, who became a WHC shareholder, officer, and director. In 15 months, WCC had added 58 stores.

24. TCB did not learn of WCC's growth until after WCC had opened its Arizona stores and had committed to open stores in Florida. TCB did not participate in or direct WCC's expansion decisions. Those decisions were made by WCC's board and management.

25. In September 1988, Phoenix Newspapers, a WCC creditor which has filed a $2,900 claim against WCC's bankruptcy estate, wrote TCB requesting credit information on WCC. Texas statutes impose certain legal restrictions on banks concerning the disclosure of credit information to third parties. Phoenix Newspapers received a response from TCB's credit department on or about September 26, 1988, stating that the WCC loan had been handled in a satisfactory manner. There is no evidence showing whether

or not Phoenix Newspapers extended credit to WCC based on TCB's response.

26. On about November 22, 1988, TCB and WCC amended the loan agreement to modify the inventory turnover and net income financial covenants. WCC's rapid expansion increased the company's expenses beyond the level originally contemplated and forced WCC to buy large amounts of inventory that decreased its inventory turnover ratio. Inventory turns were later decreased even further because of shipping problems that WCC had with one of its major suppliers, Marushi. Marushi failed to ship bikes to WCC as scheduled in April, May, and June 1990. This forced the company to order bikes and parts from distributors, which harmed the company's margins. Once Marushi's shipment finally arrived, WCC was left with too much inventory. The inventory glut was expected to improve with the opening of Arizona and Florida stores.

27. In December 1988, the original equity investors contributed an additional $1 million in capital to WCC. In return, WHC issued 696,669 more shares of common stock to these investors commensurate with their respective capital contributions. These shareholders paid $1.33 per share. After this contribution, the shareholders of WHC were:

| | Shares Held |
|---|---|
| **Duncan Cook Group:** | |
| John H. Duncan, Sr. | 105,408 |
| John H. Duncan, Jr. | 32,433 |
| Jeaneane Duncan | 32,433 |
| Gerald D. Hines | 72,975 |
| Jeffrey C. Hines | 48,650 |
| Edward Randall, III | 121,625 |
| Charles W. Duncan, Jr. | 40,542 |
| Charles W. Duncan, III | 40,542 |
| Mary Anne Duncan | 40,542 |
| Stephen C. Cook | 40,542 |
| George B. Kelly | 20,271 |
| Fred R. Lummis II | 20,271 |
| Duncan, Cook & Co. | 121,625 |
| | 737,859 |
| **Stewart Masterson Group:** | |
| Stewart G. Masterson, Jr. | 160,000 |
| Harris Masterson, III | 40,000 |
| Wayne G. Wickman | 65,000 |
| | 265,000 |
| **SGM Replacement Buyer:** | |
| Duncan, Cook & Co. Nominee | 85,186 |
| Michael F. Spratt, Nominee | 55,231 |
| **Michael Spratt Group:** | |
| Michael F. Spratt | 365,000 |
| B.H. Spratt | 45,407 |
| Merrill J. Foote | 61,499 |
| David A. Luxem | 6,487 |
| | 478,393 |
| **New Buyer Group:** | |
| David A. Luxem | 30,000 |
| Steven Moon | 15,000 |
| | 45,000 |
| **Total equity** | 1,666,669 |

28. In conjunction with the December stock issuance, TCB increased its revolving line of credit to $3.5 million.

29. On April 1, 1989, WCC's audited financial statement for the fiscal year ended March 31, 1989, showed a net loss of $1,155,-513. However, most of the loss was due to the non-cash items of depreciation ($512,948) and amortization ($620,269). The net cash flow loss from WCC's operations was only $22,296, despite substantial costs of opening 34 new stores and despite disappointing initial sales at these new stores.

30. On May 1, 1989, Spratt and John Duncan were elected to WCC's board of directors. On May 22, 1989, Masterson resigned from WHC's board and as WCC's president.

31. In May 1989, Schenkers International, a WCC creditor that has filed a $114,000 claim in WCC's bankruptcy case, wrote TCB requesting credit information on WCC. On May 31, 1989, TCB responded that the WCC loan facilities had been handled in a satisfactory manner.

32. Schenkers International extended WCC $11,064 of credit on April 3, 1990 and another $73,379.00 from May 17, 1990 through September 1990.

33. On about June 22, 1989, WCC and TCB amended the loan agreement again to modify five of the six financial covenants.

WCC represented to TCB that it was planning a $3 million preferred stock offering scheduled for the fall of 1989 and that Spratt had agreed to defer payment of the $500,000 note. TCB was informed that sales in 1989 were below projections because the new Florida stores were getting off to a slow start. This situation was expected to improve as the stores matured. In conjunction with this amendment, Spratt and Duncan Cook committed to inject $500,000 equity into WCC by October 31, 1989.

34. In June 1989, WCC and Odis Harris ("Harris") entered into an agreement whereby WCC would buy 10 bicycle stores Harris owned in the Fort Worth area. WCC agreed to pay Harris $150,000 and to issue him 200,000 shares of WHC stock valued at $600,000. Harris became an officer of WCC and a director on the WCC and WHC boards. Harris was a close business associate of Spratt.

35. On June 22, 1989, TCB loan officer Loren Jensen prepared and submitted a presentation to TCB's Loan and Discount Committee seeking approval for certain amendments to the loan agreement modifying the equity, inventory turnover, interest coverage, debt service, and adjusted net income financial covenants. The presentation also recommended a downgrade of the loan from a 6 to a 7. The Loan Committee approved Jensen's recommendations.

36. In August 1989, Andersen issued its audit of WCC's financial statement dated April 1, 1989. This audit stated that WCC's gross profit margin was 48.7% and that WCC's net loss from operations for the 1989 fiscal year was $22,296.

37. On September 5, 1989, Jensen prepared and submitted a presentation to TCB's Loan and Discount Committee seeking approval for a third amendment to the loan agreement to modify some additional financial covenants. In that presentation, Jensen recommended that the loan remain a grade 7. The Loan Committee approved the amendments but downgraded the loan to 8P ("P" stands for "performing").

38. At this time, WCC reported to TCB that its mis-forecast of new store sales was the result of a surprising countercyclical trend in Arizona and Florida. Traditionally, sales were strongest in the months of May through August. This was not the case for Florida and Arizona, where WCC had not predicted that these stores' sales would be strongest in the fall and winter months. Also, the company reported to TCB that it had engaged Rotan Mosle to seek a major equity offering of preferred stock. The company was expecting to be in the market within a week.

39. One of the investors who contemplated investing in WCC was Armand Shapiro. Mr. Shapiro requested a meeting with TCB, which informed him that WCC had been in default in the past.

40. In the fall of 1989, WCC began to seek capital from outside investors. Rotan Mosle put together a new Offering Memorandum and eventually attracted new investors who committed to invest $4.0 million in WCC. These investors were principally First Century Partners, led by David Lobel ("Lobel"), and Davis Venture Partners, led by Philip Tuttle ("Tuttle"). On December 29, 1989, WCC and these new investors entered into a Stock Purchase Agreement wherein the investors proposed to contribute $4.0 million to WCC in return for 1,500,000 shares of preferred stock in WHC at a price of $2.50 per share. After closing, Tuttle and Lobel were elected to WCC's board of directors; Jeaneane Duncan and David Luxem resigned as WCC directors.

41. As the largest owners of WHC preferred stock, First Century Partners and Davis Venture Partners became the controlling shareholders of WHC.

42. As a result of the offering of preferred stock, Duncan Cook's ownership of WHC's fully diluted stock was reduced to 18%. TCB amended the Buy/Sell Voting Agreement to require that Duncan Cook own 10% of WCC's fully diluted stock.

43. In order to make the $4.0 million investment, Tuttle and Lobel required that SWI be merged into the WHC companies. Spratt and SWI agreed, and SWI was then merged into and became a wholly owned subsidiary of WCC. Simultaneously, all debt

obligations owed by WCC to SWI were canceled.

44. WCC used the $4 million to pay Odis Harris ($130,000), WCC trade creditors ($2,260,000), TCB ($1,285,000), closing costs ($260,000), and accrued professional fees ($65,000).

45. On February 6, 1990, Jensen prepared a presentation to TCB's Loan Committee wherein he recommended, and the committee approved, amending the loan agreement to modify many of the financial covenants.

46. In early May 1990, WCC learned that a significant inventory shrinkage problem existed. The initial estimates were that WCC's inventory would have to be written down by $2.1 million. The inventory write-down was later determined to be approximately $4.5 million.

47. In response to this distressing news, the new investors, Tuttle and Lobel, met with John Duncan and Carlos Duncan on May 15, 1990, to discuss strategy. Lobel suggested that WCC hire GDL Management, Inc. ("GDL"), a crisis management company from New York with which Lobel had worked in the past. The WCC board interviewed GDL and decided to hire GDL as its Crisis Management CEO on an interim basis. The board placed Spratt on a leave of absence from his duties as CEO. Spratt, however, remained a director. Tuttle was appointed as interim chairman.

48. After GDL had been employed, WCC informed TCB of the inventory write-down and the decision to hire GDL. The inventory write-down had the impact of placing WCC in default of numerous financial covenants under the amended loan agreement. TCB met with WCC's board and GDL on about May 17, 1990, to discuss the situation. Because the loan was in default, TCB had the right under the Loan Agreement to accelerate the notes. Instead, TCB elected to work with the company to give it some time to solve its immediate management and cash problems.

49. At the May 17, 1990 meeting, WCC asked TCB for a 30–day moratorium on all debt payments. TCB agreed to comply with this request, provided the company paid the $670,000 of BA's (Bankers Acceptances, which are, in essence, postdated drafts accepted by the bank that are the primary obligation of the company and the secondary obligation of the bank) that would mature in the subsequent four weeks. WCC responded that it intended to use payables management techniques to generate $750,000 in available cash. WCC proposed that TCB pay $493,000 of the maturing BA's and WCC would pay the remaining $529,000. TCB agreed to comply with this proposal.

50. Throughout the summer of 1990, WCC explored numerous options for recapitalization. It engaged in discussions with its trade creditors, with TCB, and with potential buyers of stores. In addition, it explored the possibility of additional capital investment. WCC retained Bob Mottern with the firm of Weil, Gotshal & Manges in the summer of 1990 and paid a retainer of $80,000 to $90,000.

51. Phoenix Newspapers extended credit to WCC on June 23 and June 30, 1990, in the total amount of about $2,900. There is no evidence that Phoenix Newspapers relied on TCB's September 1988 inquiry response to extend this credit.

52. During the 90–day preference period (from May 7 through August 7, 1990), WCC made no payments to TCB on the term and revolving notes, which amounts should have been about $225,000. Yet TCB advanced WCC over $493,000 to pay maturing BA's during this same period while WCC made payments of over $1,180,000 to its trade creditors. Between April 28 and July 28, 1990, WCC's trade debt was reduced by $662,436.60.

53. On August 6, 1990, WCC and WHC held a telephonic board meeting. In attendance were directors Spratt, Harris, John Duncan, Carlos Duncan, Tuttle, and Lobel. Also present was Bob Mottern, bankruptcy counsel to WCC, and Steve Moon, WCC's CFO. The meeting was tape-recorded by Spratt, unbeknownst to all others present. During the meeting, the board had some questions it wanted to ask TCB regarding its willingness to support the company for a few

more weeks. Bill Clark, TCB's workout officer handling the WCC credit, was contacted by telephone and asked to answer certain questions. Clark responded to the board's questions and expressed TCB's concerns about WCC's deteriorating situation. Later, after releasing Clark, WCC, WHC, and SWI voted to file for Chapter 11 bankruptcy protection. Bankruptcy petitions were filed the next day.

54. After filing, WCC entered into a postpetition financing agreement with TCB. This agreement was approved by the court in August 1990. TCB later filed a proof of claim in the amount of over $4.9 million wherein it asserted a secured status.

55. WCC continued to operate postpetition and began liquidating its unprofitable stores. GDL continued to serve WCC as its CEO until it was replaced in November 1990 by Sam Susser. Susser continued to serve as WCC's president until WCC was placed into Chapter 7 liquidation on March 7, 1991.

*Specific Fact Findings*

56. The transaction of April 18, 1988, was an asset sale rather than a stock sale.

57. The transaction was an arm's-length sale conducted between a willing buyer and a willing seller.

58. WCC used the equity and TCB's loan to acquire assets valued at approximately $7.5 million. Therefore, WCC received reasonably equivalent value for the transfer of the security interest to TCB.

59. The trade names and trademarks acquired by WCC had been used in commerce for many years in their geographic region.

60. The Spratt and SWI noncompete agreements were valuable assets acquired by WCC, although the valuation placed on Spratt's and SWI's two-year noncompete agreements of $1,050,000 was questionable. Spratt had built the largest bicycle chain in the United States. He had extensive contacts in the industry and good relations with trade creditors. He had also developed a system that enabled him to build out a store for much less than the industry average. These plans for prefabricating stores were transferred to WCC as part of the asset purchase agreement.

61. The SWI stores had demonstrated an ability to generate up to $1 million profit per year. The stores' potential future profit-making ability represented significant value to WCC.

62. The creditors of SWI did not release SWI from its obligation to pay the debts owed. Thus, the SWI creditors had two sources from which to obtain payment of the debts that were outstanding on the date of the transaction.

63. The financial projections prepared by TCB and WCC were not intended to predict that, despite a massive expansion program, WCC would have sufficient assets and would generate sufficient cash flow from its operations to pay its debts as they became due.

64. The rapid expansion engaged in by WCC after April 18, 1988, was not foreseeable by TCB and was not contemplated by the parties on the date of the transaction. On April 18, 1988, the parties envisioned only minimal expansion, which would be funded from the company's available cash flow and by buying out competitors with WCC stock.

65. SWI's past performance demonstrated ability to generate sufficient cash to pay the contemplated debts of WCC only if inventory and management were controlled.

66. The Trustee did not prove that on April 18, 1988, WCC had insufficient assets in relation to its business and the transaction in which it was engaged or about to engage. On April 18, 1988, the business in which WCC was about to engage was a 40-store company plus an unknown number of other stores.

67. The Trustee did not prove that on April 18, 1988, WCC or any of its investors intended or believed that WCC would incur debts beyond its ability to pay as they became due.

68. TCB did not exercise actual managerial control over WCC. It was not an officer, director, or employee of WCC. TCB never had authority over WCC so as to unqualifiedly dictate WCC's corporate policy and disposition of its corporate assets. Therefore, TCB was at no time an insider of WCC.

69. Although John Duncan was TCB's agent or representative, he did not serve on WCC's board at TCB's request or under TCB's direction or control.

70. TCB was not a fiduciary of WCC.

71. On April 18, 1988, WCC was not undercapitalized in light of the circumstances existing on that date.

72. TCB was not responsible for WCC's capital structure. TCB was not a shareholder of WCC or WHC and therefore could not and did not control WCC's capitalization. TCB did not execute a conscious plan to undercapitalize WCC by substituting debt funding for risk capital to defeat interests of junior creditors.

73. Even if WCC was undercapitalized as of April 18, 1988, TCB did not know and should not have known this to be the case.

74. TCB did not direct or control WCC's expansion plans or strategy.

75. TCB misrepresented facts to creditors to whom it issued credit inquiry responses.

76. There is evidence that TCB issued responses to Welsher Parts, General Bicycle, Innovative Office Systems, Weingarten Realty, and Schenkers International (on December 4, 1989), which inquired of TCB about the status of the WCC loan. However, there is no evidence shown by the Trustee that these creditors extended credit to WCC in reliance on TCB's response.

77. The only creditors who may have received credit inquiry responses from TCB and who remain creditors of WCC today are Phoenix Newspapers and Schenkers International.

78. The Trustee did not prove that Phoenix Newspapers extended credit to WCC on June 23 and June 30, 1990, in reliance on TCB's credit inquiry reply dated September 26, 1988.

79. The Trustee did not prove that Schenkers International extended credit to WCC in April and May through July of 1990 in reliance on TCB's credit inquiry reply dated May 31, 1989.

80. Therefore, even though TCB's responses could be construed as misleading, the Trustee did not show the creditors to be injured by them.

81. The Trustee did not prove that any other creditors who may have received allegedly misleading credit inquiry responses were harmed by any response that they may have received from TCB.

82. TCB did not reach an agreement with WCC or GDL with respect to payables management. This technique was proposed and instituted by GDL.

83. The Trustee did not prove TCB's alleged agreement with GDL with respect to payment of Bankers Acceptances was inequitable conduct or resulted in harm to WCC's creditors. During the summer of 1990, the debt owing to the trade creditors was reduced by $662,436.60.

84. Clark's telephone remarks to the WCC board on August 6, 1990, did not constitute inequitable conduct meriting subordination. His comments were solicited by WCC and merely represented what TCB's options were.

85. The postpetition financing agreement approved by this Court was not negotiated at arm's length between WCC and TCB, and it may have constituted inequitable or egregious conduct meriting subordination of TCB's claim. However, the terms of this agreement were the subject of a dispute between TCB and the Trustee, which was resolved by a Settlement Agreement dated April 10, 1992. Pursuant to the terms of the Settlement Agreement, the Trustee has released TCB from any claim involving the postpetition financing agreement.

86. The Settlement Agreement also altered TCB's proof of claim against WCC's and WHC's estates. TCB and the Trustee agreed that TCB's claim would be severed into an allowed claim for $1 million and an unsecured claim for $3.3 million. In consideration for TCB's agreement to transform three-fourths of its claim to an unsecured status, the Trustee paid TCB $1 million on its allowed secured claim, released TCB from all claims relating to the bankruptcy cases, and reserved a right to equitably subordinate

its claim, which now stood at $3.3 million, or file other avoidance actions. The right reserved by the Trustee was valid only against that which he agreed to in the Settlement Agreement.

### Conclusions of Law

*Fraudulent Transfer*

■ 1. The Trustee has the burden to prove each element of his state-law fraudulent transfer claim, which he asserts under 11 U.S.C. § 544.

2. Under § 24.005(a) of the Texas Business and Commerce Code, the Trustee, after establishing that he has standing to sue on behalf of a creditor whose claim arose within a reasonable time after the transfer, must satisfy a two-prong test:

(1) WCC made a transfer or incurred an obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and either

(2)(A) At the time of the transfer or incurrence of the obligation, WCC was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to its business or transaction; or

(B) At the time of the transfer or incurrence of the obligation, WCC intended to incur, or believed that it would incur, debts beyond its ability to pay as they became due.

*Reasonably Equivalent Value*

3. The April 18, 1988 transaction was an "asset sale" and not a "stock sale." *See Ferrari v. Barclays Business Credit, Inc. (In re Morse Tool)*, 148 B.R. 97, 134 (Bankr. D.Mass.1992). WCC had no corporate existence prior to the acquisition. WCC did not transact business and had no creditors before the sale. But for the sale, WCC would have been an empty shell corporation with no assets to encumber or deplete. *Id.* at 134–35. The assets WCC received in the acquisition comprised the consideration it received for the transfer it made. *Id.* at 135.

■ 4. Under the Texas Business and Commerce Code, "assets" include "property

of the debtor," excluding property to the extent encumbered by a valid lien. § 24.-002(2). The term "assets" encompasses intangible as well as tangible property. *Airflow Houston, Inc. v. Theriot*, 849 S.W.2d 928, 932 (Tex.App.—Houston [1st Dist.] 1993, no writ); Unif. Fraud. Transfer Act § 1, Comment 4.

■ 5. In determining whether WCC received reasonably equivalent value, the Court must weigh the "value" of the property received by WCC against the "value" of the property it transferred to SWI. *Matter of Besing*, 981 F.2d 1488, 1495 (5th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 79, 126 L.Ed.2d 47 (1993). There does not need to be exact mathematical equivalence. *Southmark Corp. v. Riddle (In re Southmark Corp.)*, 138 B.R. 820, 829 (N.D.Tex.1992).

■ 6. Because WCC's bankruptcy was not imminent on the date of transfer, the basis upon which WCC's assets should be valued is a "going-concern" basis. *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1067 (3d Cir.1992); *Morse Tool*, 148 B.R. at 136.

■ 7. At a minimum, the "going-concern" value of WCC's inventory was its calculated cost of $3,999,677.

8. WCC also received fixed assets (leasehold improvements) and other property and equipment relating to 40 existing, operating retail stores plus a warehouse. These assets should also be valued on a "going-concern" basis by looking at their fair market value on the date of transfer. *Id.* at 136. The inquiry should focus on whether WCC paid a fair price, not on what its net recovery would be on liquidation. *Id.* In determining fair market value, the court may consider replacement cost, *i.e.*, what WCC would have had to pay to acquire the same property—in this case, 40 operating bicycle stores that had been established in the same location for up to 10 years. *Id.*

9. The only appraisal of WCC's fixed assets and other property and equipment is that done by Arthur Andersen. Andersen appraised WCC's fixed assets, equipment,

leasehold improvements, and other property at $1,505,950 as of the date of transfer.

10. The prepaid expenses acquired by WCC in the amount of $111,939 constitute consideration received by WCC from SWI.

■ 11. The fact that the trade names acquired by WCC were not registered did not render them valueless. Trade names are not registrable. Tex.Bus. & Com.Code § 16.08(c). But SWI's use of those names over an extended period of time gave it common-law or legal rights in those names just as if they had been registered. *See, e.g.,* CALLMANN, 4A UNFAIR COMPETITION TRADE-MARKS AND MONOPOLIES § 25.03 (1993). *See also* Tex.Bus. & Com.Code § 16.29. WCC's acquired trade names were appraised at $515,000.

12. If SWI did not have common-law rights in its trade names as it represented to WCC in the APA, the $500,000 note obligation to SWI was subject to cancellation.

13. The goodwill of the Spoke World and related stores that WCC received constitutes consideration that WCC received from SWI.

14. The gross value of the consideration WCC received from SWI must be reduced by the SWI trade payables that it assumed.

■ 15. The consideration received by WCC from SWI included the inventory ($3,999,677), fixed assets in 40 stores ($1,505,-950), noncompete agreement ($1,050,000), trade names ($515,000), and prepaid expenses ($111,939). WCC also received an ongoing business with the demonstrated ability to generate $1.0 million in profits annually. WCC used part of the TCB loan proceeds to acquire these assets. The value of these assets and the business opportunity WCC received from SWI is reasonably equivalent to the $5,185,000 it paid. The reasonableness of the consideration WCC paid is further demonstrated by subsequent investors who purchased WCC stock, *i.e.,* Harris and the First Century investors, who valued the company at $5,602,240 and $8,988,764 respectively. Therefore, the Trustee has not established that WCC failed to receive reasonably equivalent value in exchange for the transfer of the security interest to TCB.

*Unreasonably Small Assets*

16. There is little case authority defining the Texas standard by which the Court should judge whether WCC's assets were unreasonably small following the April 18, 1988 transaction. However, under § 24.-005(a)(2)(A)'s counterpart in the Bankruptcy Code, § 548(a)(2)(B)(ii), there is case authority sufficient to guide the Court in assessing the adequacy of WCC's assets under § 24.-005(a)(2)(A).

■ 17. The sufficiency of WCC's assets must be analyzed by inquiring into the reasonableness of cash flow projections given the circumstances on the date of transfer. *See Moody,* 971 F.2d at 1070; *Pioneer Home Builders, Inc. v. International Bank of Commerce (In re Pioneer Home Builders, Inc.),* 147 B.R. 889, 894 (Bankr.W.D.Tex.1992); *Credit Managers Ass'n of Southern California v. Federal Co.,* 629 F.Supp. 175, 186–87 (C.D.Cal.1986); *Murphy v. Meritor Savings Bank (In re O'Day Corp.),* 126 B.R. 370, 404 (Bankr.D.Mass.1991); *Morse Tool,* 148 B.R. at 132–33; *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.),* 100 B.R. 127, 137 (Bankr.D.Mass.1989). Unreasonably small assets signifies an inability to generate enough cash flow from operations and the sale of assets to remain financially stable. *Pioneer Home Builders,* 147 B.R. at 894. Evaluation of cash flow projections must focus on information available at the time of the transaction, not on hindsight. *Morse Tool* at 133; *O'Day* at 404. The court should principally focus not on whether the projections were correct but on whether they were reasonable and prudent at the time they were made. *Credit Managers,* 629 F.Supp. at 187. Relevant data to consider includes historical cash flow, gross profit margins, net profits, and working capital. Historical performance is an important, but not the only, indicator of WCC's future ability to generate cash and pay its debts. To a degree, the parties should account for difficulties that are likely to occur and for reasonably potential general economic downturns. The Court must "take[ ] into account that 'businesses fail for all sorts of reasons, and that fraudulent conveyance laws are not

a panacea for all such failures.' " *Moody,* 971 F.2d at 1073, quoting Markell, *Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital,* 21 IND.L.REV. 469, 506 (1988).

■ 18. The concept of unreasonably small assets is separate and distinct from insolvency. If these concepts were interchangeable, one would expect the Legislature to have employed the same language. *Moody,* 971 F.2d at 1070. Unreasonably small capital is not the equivalent of insolvency in either the bankruptcy or equity sense. *Vadnais Lumber Supply,* 100 B.R. at 137. The Texas Uniform Fraudulent Transfer Act (the "Texas Act") defines insolvency to exist when (a) a debtor's debts exceed his assets at a fair valuation or (b) a debtor is unable to pay his debts as they become due. The Texas Act, however, does not define the converse—that insolvency constitutes unreasonably small assets. In sum, the proper question under § 24.005(a)(2)(A) is: Did WCC have the ability to generate sufficient cash flow on the date of transfer to sustain its operations? Ultimately, to answer this question, the Court must analyze the reasonableness of the parties' projections.

■ 19. TCB's no-growth (or low case) projections assumed that sales would remain static over the loan's five-year history. This assumption was reasonable in light of the facts · that the company's same-store sales had increased 25% and 6% over the last two years, industry sales had similarly increased, and industry trends indicated further increased bike sales due to the upcoming Olympics and increased fitness awareness. Also, many of the 40 stores were new stores that had not reached their full sales potential, and the same sales staff would remain at the stores, ensuring continuity. The company's gross profit margin was assumed to continue at its historical 45% level, as verified by Arthur Andersen. The general and administrative expenses were assumed to increase from 31.5% to 33%. This assumption is reasonable in light of Arthur Andersen's verification of SWI's past expense accounts. The 1.2 inventory turn assumption represented SWI's historical rate. Despite the fact that SWI ranked in the bottom quarter of the bike industry in inventory turns, TCB assumed that the turn level would not improve.

20. Given these reasonable assumptions, it was projected that by the time the term loan was paid in 1994, $1.495 million would be outstanding on the revolving loan and an addition $500,000 would be available thereunder. In subsequent years, this remaining debt was projected to be paid down by $511,000 in 1995 and another $805,000 in 1996. The no-growth projections thus provided for payment of the loan and WCC's other debts as they became due in its operating business cycle.

21. For these reasons, the April 18, 1988 transaction did not leave WCC with unreasonably small assets in relation to its business.

*Incurrence of Debt and Inability to Pay*

■ 22. To prevail under § 24.005(a)(2)(B), the Trustee must prove that on the date of the challenged transfer, WCC intended to incur, or believed that it would incur, debts beyond its ability to pay as they became due.

23. Here, the Trustee has not demonstrated by a preponderance of the evidence that on the date of the transfer, April 18, 1988, WCC intended to incur debts beyond its ability to pay. Indeed, the evidence is directly contrary to this assertion. The shareholders invested substantial sums in WCC with the expectation of making a profit. They did not intend to incur excessive debts that would eventually lead to the loss of their $1 million to $2 million investment.

*Equitable Subordination*

■ 24. TCB's claim may be equitably subordinated under the following circumstances:

(1) The bank engaged in some type of inequitable conduct;

(2) The bank's misconduct resulted in injury to the creditors or conferred an unfair advantage on the bank; and

(3) Equitable subordination of the bank's claim is consistent with the provisions of the Bankruptcy Code.

*Smith v. Associates Commercial Corp. (Matter of Clark Pipe and Supply Co., Inc.),* 893 F.2d 693, 699 (5th Cir.1990).

25. The Fifth Circuit has recognized three types of "inequitable conduct" warranting subordination: (1) fraud, illegality, or breach of fiduciary duty; (2) undercapitalization; or (3) a claimant's use of the debtor as a mere instrumentality or alter ego. *Id.*

26. Equitable subordination is by nature an unusual remedy and should be applied only in limited circumstances. This doctrine should be applied only when (i) a fiduciary of the debtor misuses his position to the disadvantage of creditors, (ii) a third party controls the debtor to the disadvantage of creditors, or (iii) one creditor defrauds other creditors. *Freytag v. American Federal Bank, F.S.B. (In re Freytag),* 155 B.R. 150, 156 (Bankr.N.D.Tex.1993).

27. The doctrine is remedial, not penal, and should be applied only to the extent necessary to offset the specific harm suffered by the creditors on account of the inequitable conduct. *Fabricators, Inc. v. Technical Fabricators, Inc. (Matter of Fabricators, Inc.),* 926 F.2d 1458, 1464 (5th Cir. 1991).

28. The level of scrutiny that the Court should apply depends on whether TCB is determined to be an insider. TCB's proof of claim enjoys prima facie validity which may only be overcome by the Trustee's presentation of competent, credible evidence. *Wilson v. Huffman (In re Missionary Baptist Foundation of America),* 818 F.2d 1135, 1143 (5th Cir.1987). The Trustee's equitable objection to TCB's claim must contain some substantial factual basis. *Id.; Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692, 701 (5th Cir.1977). If an equitable subordination claim arises from dealings between a debtor and a fiduciary or an insider, such dealings should be rigorously scrutinized by the Court, but the mere fact of an insider or even a fiduciary relationship is insufficient to warrant subordination. *Missionary Baptist,* 818 F.2d at 1143. Once the Trustee submits substantial evidence to meet his prima facie showing, the insider or fiduciary must prove his good faith and fairness in the dealings. *Id.* at 1144; *Summit Coffee Co. v. Herby's Foods, Inc. (In re Herby's Foods, Inc.),* 2 F.3d 128, 131 (5th Cir.1993). This allocation of proof provides the proper balance of burdens, assuring that the Trustee does not underprove his objections while, at the same time, assuring that the fiduciary need not overprove his good faith and fairness at the mere cry of inequity by the Trustee. *Machinery Rental, Inc. v. Herpel (Matter of Multiponics, Inc.),* 622 F.2d 709, 714 (5th Cir.1980).

29. To determine whether TCB is an insider, the Court must evaluate two factors:

(1) The closeness of the relationship between the transferee and the debtor; and

(2) Whether the transactions were conducted at arm's length.

*Borrowing Interests v. Allison (Matter of Holloway),* 955 F.2d 1008, 1011 (5th Cir. 1992).

30. In order for a lender to be classified as an insider, it must have exercised actual managerial control over the debtor or had some special affinity with the debtor that extends beyond an arm's-length business relationship. *Lynn v. Continental Bank, N.A. (In re Murchison ),* 154 B.R. 909, 913 (Bankr.N.D.Tex.1993). Control is not indicated by financial leverage or the ability to exercise contractual rights. To become an insider, a lender must be able to unqualifiedly dictate a corporate debtor's policy and its disposition of assets. *Id.* The Bankruptcy Code recognizes that the likelihood of damage to the interests of one's creditors is most acute when the same party-in-interest is on both sides of the transaction resulting in the transfer. *Id.* at 912, citing *Badger Freightways, Inc. v. Continental Illinois National Bank and Trust Company of Chicago (In re Badger Freightways, Inc.),* 106 B.R. 971, 982 (Bankr.N.D.Ill.1989). That danger exists only when the lender exerts actual control over the borrower or when the lender-borrower relationship is close enough to gain an advantage attributable simply to affinity rather than to the course of business dealings between the parties. *Id.* The Trustee

has not shown that such circumstances exist in this case, and the Court concludes that TCB was not an insider of WCC.

31. The seminal case of *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), established the court's power to convert a claimant's purported loan to equity. *See Holt v. FDIC (Matter of CTS Truss, Inc.),* 868 F.2d 146, 149 (5th Cir.1989).

32. The Fifth Circuit has followed the standards of *Pepper v. Litton* in determining whether loans to corporations should be treated as equity contributions. *See, e.g., Spach v. Bryant,* 309 F.2d 886, 888 (5th Cir.1962); *Multiponics,* 622 F.2d at 717; *Fabricators,* 926 F.2d at 1465; and *Herby's Foods,* 2 F.3d at 131. In each case, the defendant was a fiduciary who was a dominant or controlling shareholder of the debtor. In no case was the defendant an outsider, nonfiduciary creditor like TCB.

33. *Pepper v. Litton* and its progeny permit conversion of a fiduciary's debt to equity on account of undercapitalization where there was a conscious plan by a fiduciary or control person to undercapitalize a debtor by substituting debt funding for risk capital to defeat interests of junior creditors. *See CTS Truss,* 868 F.2d at 149. The Fifth Circuit established that fiduciaries and insiders are distinguishable and not treated the same for all purposes of subordination:

> We are not persuaded that the fact that one is deemed an "insider" under the Bankruptcy Code necessarily means that one is a fiduciary ... "[I]f the insider claimant has no fiduciary responsibilities, his claims, while closely scrutinized, should only be subject to subordination on grounds that would apply equally to outsiders."

*Missionary Baptist,* 818 F.2d at 1144 & n. 8, quoting COLLIER ON BANKRUPTCY ¶ 510.-05[3][a] at 510-14.

34. Unless it is a WCC fiduciary, TCB's loan may not be equitably converted to equity on account of WCC's undercapitalization.

35. A lender's debt cannot be subordinated on the basis of a debtor's undercapitalization or because the lender should have known the company would fail.

*Pinetree Partners, Ltd. v. OTR (In re Pinetree Partners, Ltd.* ), 87 B.R. 481, 490 (Bankr. N.D. Ohio 1988); *Rosania v. Haligas (In re Dry Wall Supply, Inc.* ), 111 B.R. 933, 938-39 (Bankr.D.Colo.1990). Miscalculations by a lender as to the profitability of a project hardly constitute conduct that can be characterized as inequitable and result in subordination. *Pinetree Partners,* 87 B.R. at 490. Thus, as a matter of law, the Court must deny the Trustee's claim of inequitable conduct arising from TCB's purported knowledge or ability to know that WCC allegedly was undercapitalized.

36. WCC's capitalization was inadequate if, in the opinion of a skilled financial analyst, WCC's capitalization would definitely be insufficient to support a business the size and nature of WCC in light of the circumstances existing at the time WCC was capitalized. Alternatively, WCC's capitalization was inadequate if, at the time the advances were made, WCC could not have borrowed a similar amount of money from an informed outside source. *Multiponics,* 622 F.2d at 717.

37. Subsequent capital injections into WCC are relevant to the organizers' financial commitment, *Multiponics* at 717-18, and are thus relevant to the Court's assessment of WCC's capitalization.

38. The Trustee has failed to bring forward credible evidence to establish that WCC was undercapitalized on April 18, 1988.

39. As the Court discussed *supra,* the Trustee has presented no evidence that TCB exercised actual managerial control over WCC. Therefore, subordination of TCB's debt is not warranted based on the claim of inequitable control. Mr. Clark's comments to the WCC board of directors at the meeting on August 6, 1990, were solicited by WCC, and the agreement respecting Bankers Acceptances was appropriate in light of TCB's other option, namely acceleration. In addition, the Bankers Acceptances agreement did not harm WCC's creditors because the agreement allowed WCC to stay in business during the summer of 1990. During that period, WCC paid over $1.1 million to trade creditors, whose debts overall were

reduced by $662,000, while TCB's debt increased by $493,000.

40. As a matter of law, the Buy/Sell Voting Agreement does not constitute control or overreaching so as to subject TCB's claim to equitable subordination. More importantly, no creditor was harmed by this agreement, and no unfair advantage was conferred on TCB.

41. As a matter of law, the Warrant acquired by TCB does not constitute control or overreaching so as to subject TCB's claim to equitable subordination. Moreover, no creditor was harmed by the warrant, and no unfair advantage was conferred on TCB.

### JUDGMENT

For the reasons stated in this Court's Findings of Fact and Conclusions of Law, signed September 2, 1994, judgment is hereby rendered for the DEFENDANT, Texas Commerce Bank–Houston, N.A., on all matters complained of by the plaintiff, Duke Salisbury, Chapter 7 Trustee, in this adversary proceeding.