## In re LIBERTY LIVESTOCK COMPANY, Debtor.

Christopher J. REDMOND, Trustee of the Bankruptcy Estate of Liberty Livestock Company, Plaintiff,

v.

## ELLIS COUNTY ABSTRACT & TITLE CO., Defendant.

Bankruptcy No. 92–10660–7.

Adversary No. 94–5048.

United States Bankruptcy Court, D. Kansas.

July 2, 1996.

---

Christopher J. Redmond, Trustee, Overland Park, KS.

Laurie B. Williams, Wichita, KS.

James D. Holt, Wichita, KS.

Eric D. Bruce, Wichita, KS, for Liberty Livestock Co.

## MEMORANDUM OPINION AND ORDER

JULIE A. ROBINSON, Bankruptcy Judge.

Trustee Christopher J. Redmond filed a Motion for Partial Summary Judgment, seeking judgment on Count I of his Complaint to avoid nine transfers and recover $102,341.43 plus interests and costs, pursuant to 11 U.S.C. §§ 547 and 550. The Trustee contends that in the year preceding its bankruptcy, Liberty Livestock Company made

nine preferential transfers to Ellis County Abstract & Title Company ("ECA"), a related company. ECA contends that the Trustee cannot recover one such transfer because ECA acted as a conduit of the funds, rather than as an initial transferee under § 550. With respect to the eight other transfers, ECA contends that the transfers are excepted from avoidance pursuant to § 547(c)(2) and (4) because they were in the ordinary course of business, or preceded subsequent advances for new value.

### JURISDICTION

The Court has jurisdiction over this proceeding. 28 U.S.C. § 1334. This is a core proceeding. 28 U.S.C. § 157(b)(2)(F).

### DETERMINATIONS OF FACT

The Pretrial Order contains stipulations of fact which are paraphrased in pertinent part as follows.[1] Liberty Livestock Company was insolvent at all times from March of 1991 through March 2, 1992, the date it filed its bankruptcy petition. At the time of the transfers in issue, Tom Wasinger was the president of both ECA and Liberty Livestock; and his wife, Barbara Wasinger, was the sole shareholder of both companies. In his capacity as president, Tom Wasinger exercised control of both Liberty Livestock and ECA.

In addition, based on the pleadings, interrogatories, excerpts of depositions, answers to interrogatories and affidavits, and attached exhibits, the Court makes the following additional determinations.

■ From on or about September 24, 1990 to on or about November 8, 1991, ECA, a title and abstract company, made a series of short term loans to Liberty Livestock, a company that owned and operated a cattle feed lot. These loans were not documented by promissory notes or written agreements. There were no formal corporate meetings at ECA or at Liberty Livestock to authorize these transactions. Tom Wasinger authorized these loans to alleviate Liberty Live-

---

1. The stipulations include information concerning the ownership and control of T.B. Maak, an issue not pertinent in this case.

stock's cash flow problems and allow it to continue to operate. ECA similarly made loans to another company that Wasinger managed during this period.[2]

In the year preceding Liberty Livestock's bankruptcy, it transferred funds to ECA as follows. On March 15, 1991, Liberty Livestock transferred $8666.43 to ECA in repayment of an $8500 loan on January 24, 1991 (approximately 50 days between loan and repayment).

On April 4, 1991, Liberty Livestock transferred $12,050 to ECA in repayment of a $12,000 loan on March 26, 1991 (approximately 9 days).[3]

On May 30, 1991, Liberty Livestock transferred $10,025 to ECA in repayment of a $10,000 loan on May 21, 1991 (approximately 9 days).

On June 5, 1991 Liberty Livestock transferred $4025 and on June 10, 1991 it transferred $6000 to ECA in repayment of a $10,000 loan on May 31, 1991 (approximately 10 days between loan and full payment).

On July 2, 1991, Liberty Livestock transferred $4535 to ECA in repayment of a $4500 loan on June 12, 1991 (approximately 20 days).

On November 8, 1991, Liberty Livestock transferred $5000 to ECA in repayment of a $5000 loan on November 5, 1991. And, on November 8, 1991, Liberty Livestock transferred $2000 to ECA in repayment of a $2000 loan on November 6, 1991 (approximately 2 days).

With the exception of the last two loans on November 5 and 6, in every instance, ECA did not advance new funds until it had been fully paid for the last loan.

On or about April 25, 1991, Syracuse Feeders transferred $51,303.03 to ECA's "escrow account," number 456–856–7, which it maintained for the deposit of funds belonging to third parties. This $51,303.03 was the proceeds of sales of Liberty Livestock cattle. On April 29, ECA wire transferred $50,000 from its escrow account to Liberty Livestock. This was not a loan according to Thomas Wasinger, who stated in his affidavit that none of the funds loaned to Liberty Livestock came from this escrow account.[4] On May 3, 1991, Liberty Livestock wire transferred $50,000 to ECA's escrow account; and on May 8, ECA remitted $50,000 to Edwin Braun, for his interest in the proceeds of the cattle sale.

■ ECA had commenced making short term loans to Liberty Livestock on or about September 24, 1990. In addition to the nine transfers referenced above, from September 24, 1990 to January 17, 1991, ECA made eight loans to Liberty Livestock, which Liberty Livestock repaid on dates more than a year before it filed its bankruptcy petition. On September 24, 1990, ECA transferred $14,010.00 to Liberty Livestock; and on October 1, 1990, it transferred $10,010 to Liberty Livestock. On October 5, 1990, ECA transferred $8010 to Liberty Livestock. At this point, ECA had made three loans totaling approximately $32,000. On October 9, 1990, Liberty Livestock transferred $10,035 to ECA, apparently in repayment of the October 1 loan. On October 12, Liberty Livestock transferred $14,035, apparently in repayment of the September 24, 1990 loan. On October 22, ECA transferred $5010 to Liber-

---

**2.** The Trustee disputes this assertion in Thomas Wasinger's affidavit but does not support this controversy by any reference to the record. Therefore, the Court accepts Wasinger's statement as uncontroverted.

**3.** Liberty had repaid the January 24 loan with an insufficient funds check on March 11, which it then replaced with a good check on March 15. Similarly, Liberty repaid the March 26 loan with an insufficient funds check on March 28, which it replaced with a good check on April 4, 1991.

**4.** In his Reply to ECA's Response, the Trustee attaches as Exhibit F copies of the $5000 and

$2000 checks, dated November 8, 1991, from Liberty Livestock to ECA. The memo line on each check notes "Repay loan." One of these checks is payable to "ECA" and the back of the check illustrates that it was deposited in Account number 114–358–1. The other check is payable to "ECA escrow" and the back of the check illustrates that it was deposited in the escrow account, number 456–856–7. This exhibit was not identified or authenticated by deposition or affidavit testimony. On the other hand, in its Reply to the Trustee's Reply, ECA did not object to or dispute the authenticity of this exhibit.

ty Livestock; and on October 24, ECA transferred $1710 to Liberty Livestock. At this point, the October 5 loan was still unpaid. From October 25 through October 31, Liberty Livestock transferred $1715, $5025 and $8050 apparently in repayment of the loans on October 5, October 22 and October 24. On November 26, 1990, ECA transferred $8000 to Liberty Livestock.[5] On December 28, Liberty transferred $8065 to ECA in apparent repayment. On January 4, 1991, ECA transferred $5010; and on January 17, 1991, it transferred $6510 to Liberty Livestock. On January 18, 1991, Liberty Livestock transferred $11,547 to ECA in apparent repayment of the January 4 and 17 loans.[6]

Liberty Livestock's bankruptcy schedules list assets with a total value of $902,623 and secured and unsecured debts totaling $847,-466. The general unsecured claims filed in the Liberty Livestock case total approximately $13,000,000. The Trustee stated in an affidavit that any payments received by ECA enabled it to receive more than it would have received if the payments had not been made and the debtor's estate was liquidated according to the provisions of the Bankruptcy Code.

## ANALYSIS

Rule 56 of the Federal Rules of Civil Procedure governs summary judgments, and is made applicable to bankruptcy adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure. Rule 56, in articulating the standard of review for summary judgment motions, provides that judgment shall be rendered if all pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there are no genuine issues of any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Fed. R.Bankr.P. 7056.

The Trustee seeks summary judgment on Count I of his Complaint, to avoid nine transfers totaling $102,341.43, as preferential transfers pursuant to 11 U.S.C. § 547.[7]

## I. § 547(b) Preferential Transfers

The Trustee bears the burden of proving by a preponderance of the evidence that the transfers are avoidable. 11 U.S.C. § 547(g). The Trustee contends that ECA was an insider of Liberty Livestock and thus any preferential transfers occurring within one year before Liberty Livestock filed its bankruptcy petition are avoidable. With respect to the eight transfers occurring from March 15 to November 8, 1991 (excluding the $50,000 transfer on May 3, 1991), there are some elements of a preference that are not in dispute. The parties agree that: there was a transfer of an interest of the debtor in property (funds of Liberty Livestock); to creditor ECA for or on account of an antecedent debt.[8] The parties agree that at the time of

---

**5.** This transfer is described as "Transfer from ECA Golden Belt to ECA Escrow account on behalf of Liberty Livestock."

**6.** These figures are outlined in a summary of "Short Term Loans to Liberty Livestock Company" identified as Plaintiff's (Trustee) Exhibit D attached to his Motion for Summary Judgment. The Exhibit is not authenticated nor identified by affidavit or in any of the excerpts of deposition transcripts exhibited in the parties' motions. Nevertheless, the Court will accept this exhibit as part of the record since both of the parties refer to and rely on this exhibit in their motions.

**7.** 11 U.S.C. § 547(b) provides that:
... the trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;
(4) made—
(A) on or within 90 days before the date of the filing of the petition; or
(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

**8.** In its answer, ECA denied that these transfers were for or on account of an antecedent debt; however, it is clear from its factual contentions in the Pretrial Order as well as arguments in its briefs that ECA no longer disputes this element.

these eight transfers, Liberty Livestock was insolvent. The parties agree that the eight transfers occurred within a year before Liberty Livestock filed its bankruptcy petition on March 2, 1992.

■ ECA does not concede that it was an insider of Liberty Livestock. However, its status as an insider is evident from the stipulated facts. The parties stipulated that Tom Wasinger as president of both companies, and Barbara Wasinger as sole shareholder of both companies, exercised control of Liberty Livestock and ECA. The Bankruptcy Code defines "insider" at 11 U.S.C. § 101(31)(B) as the directors, officers or persons in control of a debtor corporation. The Wasingers were insiders of Liberty Livestock. Further, the definition of "insider" includes affiliates or insiders of affiliates. 11 U.S.C. § 101(31)(E). Affiliate is further defined as a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote ... by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor; ..." 11 U.S.C. § 101(2)(B). An "entity" includes a person. 11 U.S.C. § 101(15). Barbara Wasinger was the sole shareholder of Liberty Livestock and ECA. Thus, ECA was an affiliate of Liberty Livestock, such that the Trustee may pursue transfers to ECA that occurred within the one year period before Liberty Livestock filed its bankruptcy petition.

■ ECA disputes the fifth element of a preference, that the transfers enabled it to receive more than it would have had the transfers not occurred and it were paid pursuant to the provisions of Chapter 7 of the Bankruptcy Code. However, ECA offers no genuine support for its position and presents nothing that contravenes the Trustee's affidavit or the bankruptcy schedules and proofs of claim which indicate that there are assets valued at approximately $900,000 and unsecured claims exceeding $13,000,000. It is clear that Liberty Livestock's transfers to ECA, in full repayment of its loans, enabled ECA to receive substantially more than it would have absent the transfers. As a creditor in this bankruptcy estate, it would receive

a small, if any, dividend on its unsecured claim. With respect to the eight transfers referenced above, the Trustee has established by a preponderance of the evidence that the transfers were preferential within the meaning of § 547(b).

The May 3, 1991 transfer of $50,000 is in a different posture. The uncontroverted facts concerning this transfer are that on April 25, 1991 Syracuse Feeders wire transferred $51,-303.03 in proceeds from the sale of cattle to ECA, on behalf of Liberty Livestock. ECA on April 29 wired $50,000 to Liberty Livestock and on May 3 Liberty Livestock wired $50,000 back to ECA. Finally on May 8, ECA drew a $50,000 cashier's check payable to Edwin Braun for his share of the cattle proceeds. All of these transactions occurred through ECA's escrow account.

■ The Trustee contends that this was a preferential transfer of Liberty Livestock's funds to Edwin Braun, for or on account of an antecedent debt that Liberty Livestock owed Edwin Braun. However, in his reply to ECA's response to summary judgment, the Trustee concedes that this issue is not ripe for summary judgment in light of material issues of fact. Indeed, at this juncture, the Trustee has failed to demonstrate that Edwin Braun received more than he would have had the transfer not occurred and he received payment through a chapter 7. Nor did the Trustee show that Edwin Braun was an insider of Liberty Livestock, a necessary showing since this transfer occurred more than 90 days before Liberty Livestock filed bankruptcy. While the parties agree that Edwin Braun had an interest in cattle sold by Syracuse Feeders and that he was entitled to some of the proceeds, the Court cannot ascertain from the record whether Braun was a creditor, and if so, whether he had an unsecured or secured claim. Therefore, summary judgment on the $50,000 transfer is denied as there remain genuine issues of fact concerning the preferential nature of this transfer.

■ ECA contends that to the extent the $50,000 transfer is avoidable, it is not the initial transferee under § 550, but acted as a mere conduit for the transfer of the funds,

and as a fiduciary whose escrow account was used by Liberty Livestock. Even if the Court had determined that the $50,000 transfer was preferential, this defense is not ripe for summary judgment. The Trustee may not recover funds under § 550(a)(1) from a transferee who lacked dominion or control over the funds or property. A transferee who acts as a conduit or fiduciary in holding and disbursing funds belonging to third parties is not liable as an initial transferee of a preferential transfer. *See Matter of Coutee*, 984 F.2d 138, 141 (5th Cir.1993) (holding that a fiduciary has no legal right to use or appropriate funds of another and thus has no legal dominion or control that would render it an initial transferee under § 550). *But see In re Concord Senior Housing Foundation*, 94 B.R. 180, 183 (Bankr.C.D.Cal.1988) (finding that a fiduciary who actually misappropriates money, thus wrongfully gaining dominion or control, cannot escape liability as an initial transferee under § 550 by hiding behind a fiduciary duty that it has chosen to violate).

■ By commingling third party funds with its own funds, ECA would defeat the escrow nature of the account, and in fact violate its fiduciary duty to any third parties. And, by commingling third party funds with its own funds, ECA could no longer claim a special status exempting it from liability as an initial transferee. For example, in *In re Hamilton Taft & Co.*, 53 F.3d 285, 288 (9th Cir.1995), *vacated* 68 F.3d 337 (9th Cir.1995) (vacated and appeal dismissed due to parties' settlement), the court found that the debtor, a tax preparer, was liable as an initial transferee of taxes paid by its client to the IRS, because the debtor had commingled funds of its clients in one account from which the debtor then paid its clients' tax bills. The court acknowledged the holding in *Begier v. Internal Revenue Service*, 496 U.S. 53, 61–62, 110 S.Ct. 2258, 2264–65, 110 L.Ed.2d 46 (1990), that money an employer withholds from a taxpayer's pay check constitutes "statutory trust funds" whether they are segregated by the employer or commingled with other funds, but distinguished funds held in trust pursuant to a common law trust as losing their trust status when commingled with other funds. *Id.*

The Trustee contends that Thomas and Barbara Wasinger exercised dominion and control over the escrow account to ensure that Edwin Braun and Barbara Wasinger were paid for their respective shares of the cattle proceeds. Of course, since Thomas and Barbara Wasinger were insiders of both Liberty Livestock and ECA, it is difficult to determine whether the $50,000 was transferred to Edwin Braun under the direction of Liberty Livestock or whether ECA violated its fiduciary duty by independently directing the transfer of the funds to Edwin Braun. Moreover, the Court questions whether ECA was truly a fiduciary or conduit in connection with these transactions. From the sparse record available, it would appear that on at least one occasion ECA loaned Liberty Livestock funds from the escrow account; and that on at least one occasion, Liberty Livestock made loan payments payable to the escrow account. This indication that the escrow account contained ECA funds commingled with third party funds creates a material issue of fact precluding summary judgment on this defense to § 550 liability.

## II. Defenses

There are a number of exceptions or defenses to avoidance provided in 11 U.S.C. § 547(c), including: transfers that are a contemporaneous exchange for new value given to the debtor; transfers in the ordinary course of business; and transfers that are followed by a subsequent advance of new value. In its answer, ECA alleged that the transfers were a contemporaneous exchange for value and were made in the ordinary course of business. ECA has since abandoned the defense that these transfers were contemporaneous exchanges for new value but continues to assert that they were transfers in the ordinary course of business.

### Transfers in the Ordinary Course of Business

■ Section 547(c)(2) of Title 11, United States Code, provides that a preferential transfer is not avoidable:

to the extent that such transfer was—

 (A) in payment of a debt incurred by the debtor in the ordinary course of business

or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of busi-ness or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

ECA, as the defendant/transferee, has the burden of proving its entitlement to this defense by a preponderance of evidence. 11 U.S.C. § 547(g). Essentially, it must show that the debt was incurred and paid in the ordinary course of the business of Liberty Livestock and ECA and further that such transaction was made according to ordinary business terms. *Fidelity Sav. & Inv. Co. v. New Hope Baptist*, 880 F.2d 1172, 1177 (10th Cir.1989).

 The Trustee argues that the debt was not incurred in the ordinary course of the business of Liberty Livestock and ECA because it was not ordinary for a cattle feed lot to obtain short term operating loans to cover cash flow needs; and not ordinary for an abstract and title company to make such loans. Viewed objectively, the Court agrees that abstract and title companies are not in the business of lending, despite the affidavit of Paul Brown, an owner of a cattle feed lot, who stated that cattle feed lots commonly obtain short term loans from related companies to alleviate cash flow problems. In any event, this evidence regarding similarly situated debtors is immaterial because § 547(c)(2)(A) requires that the Court determine whether the debt was incurred in the ordinary course of the business between this particular debtor and creditor. It is a subjective test. Even if the creditor is not a traditional lender, if the transaction was ordinary as between this particular debtor and creditor, then it was in the ordinary course of their business. In *Fidelity Sav. & Inv. Co. v. New Hope Baptist*, 880 F.2d 1172, 1174–78 (10th Cir.1989), the court rejected an argument that the ordinary course of business exception applies only to debts to trade creditors. In that case, the court found that a debtor who incurred debt by selling savings certificates to small investors in order to raise capital for its own business ventures (which included making consumer loans), in-

curred the debts in the ordinary course of business between itself and these small investors. In analyzing the first prong of the ordinary course of business exception, the court looked solely at the course of business between the debtor and the investors, without regard to whether it was ordinary in the debtor's industry to incur such debts. *Id.* at 1177. The court determined that the statute did not by its terms limit the exception to debts incurred from trade creditors and found further support in the legislative history that the exception had a broader application. *Id.* at 1175–77. This case is instructive that in determining whether the debt was incurred in the ordinary course, the court must consider only what is ordinary as between the debtor and the creditor. And, in this case, the court determined that incurring a debt to the small investors was a regular and necessary part of the debtor's business activities and management of its financial affairs and without which the debtor would have lacked operating funds. *Id.*

In *In re Fulghum Const. Corp.*, 872 F.2d 739 (6th Cir.1989), the court held that a debtor incurred a debt to its shareholder in the ordinary course of business when it was the practice of the shareholder to loan the debtor money on a recurring basis so that the debtor could meet immediate cash flow needs. In contrast, in *In re Valley Steel Corp.*, 182 B.R. 728, 735 (Bankr.W.D.Va. 1995), the court noted that in determining whether a debt is incurred in the ordinary course, it should consider whether it was incurred in a typical, arms-length commercial transaction that occurred in the marketplace, or as part of an arrangement between insiders.

 The purpose of the ordinary course of business defense is to encourage creditors to continue to do business with financially strapped debtors. Trade creditors will not be penalized for continuing to sell the debtor goods or services on credit. Lending institutions will not be penalized for continuing to provide unsecured loans. This exception applies, however, to more than trade creditors and traditional lenders. Other creditors who continue to provide credit or loans to the debtor should also be subject to

this defense. At times, lending institutions will refuse to advance further credit, given their ability to evaluate risk. Other creditors may be more inclined to continue to provide credit or loans. These creditors benefit the debtor by keeping its operations alive. The Court can see no persuasive reason why these creditors should be penalized but not those who happen to be in the business of lending.

ECA contends that it was ordinary for Liberty Livestock to ease its cash flow problems by obtaining short term loans, supporting its contention with affidavits from Paul Brown and Thomas Wasinger. The Trustee concedes that Liberty Livestock typically obtained short term loans from ECA, which Liberty quickly repaid in a matter of days and usually less than two weeks, after which ECA would advance more funds. Based on the history of their transactions, the Court must find that as between these two companies, it was ordinary for ECA to make short term loans to Liberty Livestock and that the subject debts were incurred in the ordinary course of business.

The Trustee further argues that the transfers in payment of these debts were not in the ordinary course of business, as required by § 547(c)(2)(B), another subjective inquiry. He detects a change in the pattern of the parties' dealings. ECA contends that it was its practice to not lend money to Liberty Livestock until the previous loan had been fully repaid. The Trustee contends that from September 1990 to January 1991, ECA made multiple loans before being repaid in whole or part, but that in the year preceding bankruptcy, ECA did not advance new funds until the last loan had been paid. Actually, a review of the transactions, which are itemized on Exhibit D attached to the Trustee's motion for summary judgment, reveals that from September 1990 to January 1991, ECA made eight loans to Liberty Livestock. Five of these loans were made at a time when Liberty Livestock still owed funds on a previous loan or loans. In comparison, from March 1991 to November 1991, ECA made eight loans,[9] and only the last loan, on November 6, 1991, was made at a time when there was an outstanding balance due on a previous loan. From September 1990 to January 1991, Liberty Livestock paid the eight loans back as quickly as one day later, or as late as thirty-two days later. From March 1991 to November 1991, Liberty Livestock paid the eight loans back as quickly as two days later and as late as fifty days later.

Thus, in one respect, in the year preceding bankruptcy, ECA seemed to tighten its lending practices, loaning only after the previous loan had been fully repaid. And, in the first series of eight loans, ECA allowed as much as $22,000 to be outstanding before it received repayment; whereas, in the second series of loans, no more than $12,000 was outstanding at any one time. On the other hand, in the year preceding bankruptcy, Liberty Livestock generally repaid the loans as rapidly as it had repaid the first series of loans.[10] From this pattern, the Court finds that the challenged transfers did not materially deviate from their established pattern of payments, such that the payments were made in the ordinary course of business between Liberty Livestock and ECA.

Section 547(c)(2)(C) requires that the transfers to and from the debtor be made according to ordinary business terms. The lack of any reference in this subsection to business terms of the debtor and creditor, has led courts to interpret this prong as an objective test, where ordinary business terms are defined with reference to the standard in the industry. *See In re Classic Drywall, Inc.*, 121 B.R. 69, 75 (D.Kan.1990) (citations omitted). In *In re Meridith Hoffman Partners*, 12 F.3d 1549, 1553 (10th Cir.1993), *cert. denied Balcor Real Estate Holdings, Inc. v. Clark*, —— U.S. ——, 114 S.Ct. 2677, 129 L.Ed.2d 812 (1994), the court held that this prong of the exception is satisfied if the debtor and creditor operated under business terms that are used in ordinary or usual

---

9. Excluding the $50,000 transfer.

10. In the first series of loans Liberty Livestock repaid the various loans in 1 day, 7 days, 11 days, 14 days, 18 days, 26 days and 32 days, for an average of 15.5 days. In the second series of loans Liberty Livestock repaid the various loans in 2 days, 3 days, 9 days, 10 days, 9 days, 20 days and 50 days for an average of 14.7 days.

situations, in normal financing relations by healthy debtors. By requiring that the debtor and creditor operate under usual or normal business terms, § 547's purpose of discouraging unusual actions that favor certain creditors is served.

■ It is evident that the Trustee is concerned because Liberty Livestock obtained loans from an affiliated company. Transfers in payment of loans between insiders deserve scrutiny, so as to insure that the underlying policy of equal treatment of creditors not be thwarted by self dealing. However, there is no per se rule that transactions among insiders are excluded from the ordinary course of business exception. This exception is unavailable unless the terms of the transaction comport with the standards of the industry so as to insure that the debtor and creditor are engaging in commercially reasonable transactions. If there is something inappropriate occurring by virtue of the affiliated status of these companies, such as unusual business terms or a change in their normal practices, § 547(c)(2)(C) precludes application of the ordinary course of business exception. Furthermore, if there is inadequate consideration flowing between creditor and debtor, the trustee can seek avoidance of the transfer as a fraudulent transfer, pursuant to § 548 or under a state law theory of recovery, pursuant to § 544.

■ There is no evidence regarding the actual terms of these transactions. The loans were not documented with promissory notes or written records, other than the bank records. ECA has utterly failed to show what the terms of these loans were. The Court has no evidence of the repayment term of the loans, the interest rate, nor other material provisions such as the definition of and remedies for default. This third prong of the ordinary business defense requires the Court to compare the terms of the questioned transaction with the terms in the industry. Brown's affidavit states that cattle feed lots obtain short term credit on particular terms, such as 30 days or 240 days, from either related companies or traditional lenders. But his affidavit does not speak to the industry standards in terms of interest, default and other standard terms of loans. Ab-

sent any showing of what the standards are in the pertinent industry, that is those engaged in the business of lending and those engaged in cattle feed lots, and absent any showing of the terms between ECA and Liberty Livestock, the Court must grant the Trustee's motion for summary judgment on ECA's ordinary business terms defense and ECA is precluded from adducing evidence at trial concerning this defense. Since ECA has the burden of proof of the defenses under § 547(c) at trial, and has failed to establish an essential element, summary judgment in favor of the movant and against ECA should be granted.

■ One of the primary reasons or purposes of summary judgment is to ferret out unsupported claims and defenses. When a claim or defense is unsupported and there is a complete failure of proof of an essential element of the nonmoving party's case, then all other facts are rendered immaterial. There simply is no genuine material fact regarding that claim that would support a summary judgment in favor of the claim or defense, and the moving party is entitled to summary judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2553.

**Subsequent Advance of New Value, § 547(c)(4)**

■ As a preliminary matter, the Trustee argues that ECA waived this affirmative defense by failing to plead the new value exception in its answer. ECA contends that it is not an affirmative defense, but that in any event the Trustee has not been prejudiced or surprised by ECA raising this exception in the Pretrial Order. Federal Bankruptcy Rule of Procedure 7008 incorporates Federal Rule of Civil Procedure 8(c), which requires the affirmative pleading of an avoidance or affirmative defense. ECA affirmatively pled the § 547(c)(4) defense in the pretrial order, entered December 22, 1995, but not in its

answer. The Trustee relies on *In re National Lumber and Supply, Inc.*, 184 B.R. 74 (Bankr. 9th Cir.1995), for his argument that ECA waived this defense. In *National Lumber*, the court concluded that § 547(c)(2) and (c)(4) are affirmative defenses, since they are matters extraneous to the plaintiff's prima facie case which defeat the plaintiff's right to recover even if all allegations of the complaint are true. *Id.* at 77–78 (citing *In re Rawson Food Service, Inc.* 846 F.2d 1343, 1349 (11th Cir.1988) and *Federal Deposit Ins. Corp. v. Main Hurdman*, 655 F.Supp. 259, 262 (E.D.Cal.1987)). However, the court also concluded that in the absence of prejudice, an affirmative defense may be raised for the first time at the summary judgment stage. *Id.* at 79 (citations omitted). In this case, ECA raised the defense in the Pretrial Order, prior to the summary judgment stage. The Trustee has not demonstrated that he has been prejudiced.

This defense, set out in 11 U.S.C. § 547(c)(4), states that a trustee may not avoid a transfer:

> ... to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
>
> > (A) not secured by an otherwise unavoidable security interest; and
> >
> > (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

In this case, ECA claims that it made a series of advances to Liberty Livestock in reliance on Liberty Livestock having fully repaid each previous advance. Indeed, the pattern of the advances and repayments demonstrates that in most instances, ECA would lend Liberty Livestock funds, which it would repay within several days or not more than two weeks. Within several days after repayment, ECA would again advance funds. Thus, Liberty Livestock never owed ECA more than $12,000 in the year preceding bankruptcy.[11]

The subsequent new value exception in § 547(c)(4) was devised as a solution for the unsecured creditor with a running account who would otherwise find the last 90 days of payments avoided by the trustee in bankruptcy. 4 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 547.12 (15th ed.1994). This exception is based on two policy considerations. First, a creditor who implicitly relies on prior payments in extending additional credit would otherwise increase its bankruptcy loss; and secondly, such creditors should be encouraged to continue their credit arrangements with financially distressed debtors, potentially helping them avoid bankruptcy. Robert H. Bowmar, *The New Value Exception to the Trustee's Preference Avoidance Power: Getting the Computations Straight*, 69 Am.Bankr.L.J. 65, 67 (1995).

■ The Trustee contends that this exception is unavailable because none of the advances that ECA seeks to use as an offset remained unpaid at the time of Liberty Livestock's bankruptcy petition. This "remains unpaid" requirement was explicit in Section 60c of the Bankruptcy Act of 1898, the predecessor of § 547(c)(4). However, § 547(c)(4) does not require that the new value advance remain unpaid. This element of the defense was eliminated.[12]

The Trustee cites a number of decisions in support of his position. *See e.g., In re Kroh Bros. Dev. Co.*, 930 F.2d 648, 653 (8th Cir. 1991); *In re New York City Shoes, Inc.*, 880

---

**11.** This excludes the $50,000 transfer, which the parties agree needs to be analyzed separately.

**12.** Section 547(c)(4) states that a trustee may not avoid a transfer under this section:

> to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
> > (A) not secured by an otherwise unavoidable security interest; and
> > (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

In contrast, § 60c of the Bankruptcy Act of 1898 stated:

> If a creditor has been preferred, and afterward in good faith gives the debtor further credit without security of any kind for property which becomes a part of the debtor's estate, **the amount of such new credit remaining unpaid at the time of the adjudication in bankruptcy** may be set off against the amount which would otherwise be recoverable from him.

F.2d 679 (3rd Cir.1989); *In re Jet Florida System, Inc.,* 841 F.2d 1082 (11th Cir.1988); *In re Ford,* 98 B.R. 669, 681 (Bankr.D.Vt. 1989). However, these decisions lack any meaningful analysis of why the "remains unpaid" element should be read back into a statute that expresses no such requirement. In *New York City Shoes,* the court did not analyze the defense in terms of a series of new advances repaid by preferential payments that were in turn the basis for more new advances. Rather, that decision addressed how to treat a postdated check in terms of determining whether it was a transfer which occurred before or after the advance of new value. *New York City Shoes,* 880 F.2d at 683–84. Nor did *Jet Florida System* address the issue at bar. In *Kroh Bros. Dev.,* the pertinent issue was whether the defense is applicable when third parties repaid the advances; but in dictum the court adopted the position of other courts that the "remains unpaid" requirement was alive and well. *Kroh Bros. Dev.,* 930 F.2d at 653.

These courts typically reason that if the new value is subsequently repaid, then the underlying basis for this new value exception no longer exists. The exception recognizes that new value in effect returns a preferential payment to the creditor back to the debtor. Monies that flowed out of the debtor's operations, in the form of a preferential payment, flow back into the debtor's operation in the form of a subsequent advance of new value. A creditor who received a preference but in effect paid it back, should not be penalized for what was initially a preferential payment. However, these courts reason, when the debtor repays the new value, the money has again flowed from the debtor to creditor. There is a negative effect on the debtor's operations that should not be excepted from recovery.

■ None of these cases address the applicability of the subsequent new value exception to a situation where the debtor continually makes payments on antecedent debt prepetition, the creditor continually advances new value on the strength of the debtor's payments, and the new value advances are in turn repaid with more transfers that serve as the basis for still more advances. The language of § 547(c)(4) makes it clear that the exception requires a particular chronology of events. First, there is an avoidable preferential payment. Next, there is a new value advance, on account of which the debtor did not make an **otherwise unavoidable** transfer. Thus, if the debtor paid for the new value advance with an avoidable transfer, the creditor is protected by the defense. The creditor can offset the new value advance against the prior preferential payment, while the trustee can recover the repayment of the new value, since that repayment is an avoidable transfer. On the other hand, when the repayment is not an avoidable transfer, the creditor cannot both offset the new value advance and keep the monies tendered in repayment. That would allow the creditor credit twice for one advance of new value.

■ Here, as Liberty repaid each new advance, its repayment was not "otherwise unavoidable." While these transfers became unavoidable when followed by another new advance, they were not "otherwise unavoidable," as nonpreferential transfers or preferential transfers excepted from recovery under other subsections of § 547(c). These transfers were unavoidable under § 547(c)(4). But, the word "otherwise" can only mean that repayments that are within the ambit of § 547(c)(4) do not defeat the application of this defense to earlier repayments. There is simply no indication that Congress intended to limit the exception to **one** subsequent advance, rather than a series of advances as in the case at bar. Indeed, this exception was created to protect creditors who lend on an open or running account. Of course, the last repayment, which is not followed by an advance of new value, is not an offsetting payment under § 547(c)(4).

The Trustee alternatively argues that the defense is not applicable to two of the transfers that were replacement checks for prior insufficient funds checks. The cases cited by the Trustee do not support this proposition, but address the effect of NSF checks on the contemporaneous exchange exception in § 547(c)(1).[13] While a replacement check for

---

**13.** *In re Barefoot,* 952 F.2d 795 (4th Cir. 1991); *In re Car Renovators,* 946 F.2d 780 (11th Cir.

an NSF check may or may not relate back to the time that the NSF check was tendered and may or may not be within the ambit of the contemporaneous exchange defense, the fact that two of the transfers in question here were replacement checks for NSF checks is inapposite. The Trustee is referring to the first two transfers, on March 15 and April 4. The March 15 check was a replacement check for an earlier NSF Check, but there weren't any advances intervening between the tender of the those two checks. The subsequent advance came **after** the March 15 check. And, this was the chronology with respect to the April check as well. Thus, in both instances, the NSF check and the replacement check preceded the subsequent advance and it can be said that the advance was on account of the prior transfer, which check in particular is immaterial.[14]

██ Another difference between the old preference statute in the Bankruptcy Act and the new one, is that the method of calculating the preference amount in light of new value advances has changed. Under the Bankruptcy Act, courts employed the net result rule, adding all preferential transfers up and then deducting the total of all new value advances for a net preference amount. This judicially devised rule of calculation is no longer necessary given an explicit exception in the new preference statute that takes into account new value advances given by the creditor. *In re Fulghum Const. Corp.*, 872 F.2d 739, 742 (6th Cir.1989).

██ Section 547(c)(4) provides that to the extent that a creditor gives new value after a transfer, the transfer that might otherwise be avoidable is not avoidable. Several rules of calculation are evident from this language. First, transfers may be offset with subsequent advances of new value but cannot be offset with prior advances of new value. Thus, the Court must look at each transfer and determine whether there has been any advance of new value subsequent to the transfer. To the extent that there has, the Trustee may not avoid the transfer. So, the Court must look at advances of new value after the transfer and must disallow avoidance of the transfer to the extent of the subsequent advance of new value. This can only mean that the Court must consider the amount of the subsequent advance and disallow avoidance of the prior transfer to the full extent of the subsequent advance. In this case, the calculation is as follows:

| Preferential Payments | Less Subsequent New Value | Balance |
| --- | --- | --- |
| $8666.43 (3/15/91) | $12,000 (3/26/91) | $0 |
| $12,050 (4/4/91) + $0 = 12,050 | $10,000 (5/21/91) | $2050 |
| $10,025 (5/30/91) + 2050 = 1,075 [15] | $10,000 (5/31/91) | $2075 |
| $4025 (6/5/91) + 2075 +$6000 (6/10/91) = 12,100 | $ 4500 (6/12/91) | $7600 |

1991), *cert. denied Heart of Dixie Nissan, Inc. v. Reynolds*, 504 U.S. 913, 112 S.Ct. 1949, 118 L.Ed.2d 553 (1992); *In re Old Electralloy Corp.*, 164 B.R. 501, 504 (Bankr.W.D.Pa.1994); and *In re So Good Potato Chip Co.*, 137 B.R. 330, 331 (Bankr.E.D.Mo.1992).

14. One of the cases cited by the Trustee, *In re So Good Potato Chip Co.*, 137 B.R. 330 (Bankr. E.D.Mo.1992), holds that a transfer that is a replacement check for an insufficient funds check is not in the ordinary course of business and is thus avoidable. In light of the Court's grant of summary judgment against ECA on the ordinary course defense, the Court need not consider whether or not these NSF checks were transferred in the ordinary course of business.

15. Adding the excess new value to the next preferential payment recognizes that as a practical matter, a creditor in making a new advance relies not only on the last payment from the debtor but on the history of payments from the debtor. On the other hand, carrying forward the excess new value seems to conflict with the rule that a creditor can use new value to offset only a prior preferential transfer, not a subsequent preferential transfer, because a new advance can hardly be on account of a payment that has not yet occurred. However, both parties submitted calculations that provided for carrying forward excess new value and there is support for this position. *See generally* Robert H. Bowmar, *The New Value Exception to the Trustee's Preference Avoidance Power: Getting the Computations Straight*, 69 Am.Bankr.L.J. 65, 67 (1995).

| Preferential Payments | Less Subsequent New Value | Balance |
|---|---|---|
| $4535 (7/2/91) + 7600 = 12,135 | $ 5000 (11/5/91) | $5135 |
| | + $ 2000 (11/6/91) | + $ |
| $5000 + $2000 (11/8/91) + 5135 = 12,135 | $ 0 | $12,135[16] |

Therefore, although the Trustee has proven that the eight transfers were preferential and ECA is not entitled to the exception in § 547(c)(2), ECA is entitled to the exception in § 547(c)(4), thus limiting the Trustee's recovery to $12,135 on the eight transfers. With regard to the $50,000 transfer, there are genuine issues of material facts regarding whether the transfer was preferential and whether the Trustee can recover such transfer from ECA pursuant to § 550.

**IT IS THEREFORE ORDERED BY THE COURT** that with regard to the eight transfers in issue, the Trustee's motion for summary judgment is GRANTED IN PART, and the Trustee is entitled to judgment in the amount of $12,135.

**IT IS FURTHER ORDERED BY THE COURT** that with regard to the $50,000 transfer, the Trustee's motion for summary judgment shall be DENIED.

This Memorandum shall constitute findings of fact and conclusions of law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure. A judgment based on this ruling will be entered on a separate document as required by Rule 9021 of the Federal Rules of Bankruptcy Procedure and Rule 58 of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.

16. The Court finds error in both parties' calculations. The Trustee calculates a net preference of $32,751.43, which is based on his exclusion of the March 15 and April 4 transfers from the calculation. ECA calculates a net preference of $8771.43, but erroneously carries forward a negative balance of new value after the March 26, 1991 advance.