In re John B. LOVE, d/b/a Record Coin Shop, Debtor.

ESTATE OF John B. Love, Plaintiff,

v.

FIRST INTERSTATE BANK OF MONTANA, Defendant.

Bankruptcy No. 91–41556–11.
Adv. No. 92/00123.

United States Bankruptcy Court, D. Montana.

June 17, 1993.

Steven E. Cummings, Murphy, Robinson, Heckathorn & Phillips, P.C., Kalispell, MT, for First Interstate Bank of Montana, N.A.

Steven M. Johnson, Esq. Church, Harris, Johnson & Williams, Great Falls, MT, and Ward E. Taleff, Alexander, Baucus & Linnell, P.C., Great Falls, MT, for Unsecured Creditors Committee.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

In this adversary proceeding, the attorneys for the Unsecured Creditor's Committee (UCC) of the estate of John B. Love, a Chapter 11 Debtor, commenced a preference action against Defendant, First Interstate Bank of Montana (FIB)[1], to recover $175,000 paid by John Love within 90 days of the filing of the Chapter 11 bankruptcy petition. After answer, trial of the cause was held on March 23, 1993. Memoranda have been filed by parties in support of their respective positions and the matter is ripe for decision. Many of the facts have been submitted by a Statement of Agreed Facts. In addition, exhibits have been entered in evidence which support the agreed facts. After examination of the agreed facts, exhibits and oral testimony, I determine the Plaintiff has sustained the burden of proof and is entitled to judgment against the Defendant Bank for the sum of $175,-000 as a preference under 11 U.S.C. § 547.

The agreed facts are as follows:

1. John B. Love filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court on or about September 20, 1991.

2. The Debtor's Plan of Reorganization was confirmed by Order of this Court on November 26, 1991. The provisions of the Plan of Reorganization include the authority of the UCC to pursue certain actions, including these adversary proceedings.

3. These proceedings are brought under Rule 7001 et seq., Federal Rules of Bankruptcy Procedure and pursuant to the Plan of Reorganization by the UCC on behalf of the estate.

4. Jurisdiction is vested in this Court by 28 U.S.C. § 1334(b) and 11 U.S.C. §§ 547(b), 548 and 510(c). The case arises under Title 11, United States Code and involves a complaint to set aside certain transfers or to obtain relief from transactions by the Debtor, and to equitably subordinate debt. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F) and (O).

5. Venue is proper in this Court by reason of 28 U.S.C. § 1409.

6. FIB is a national bank corporation with offices in Cut Bank, Montana.

7. Karla Love (KL) is the spouse of the Debtor and has been at all times relevant to these proceedings.

8. On October 23, 1990, John Love ("Debtor" or "JL") and KL executed and

---

1. Debtor's wife, Karla Love, was also named as a Defendant in this adversary proceeding. By Stipulation filed March 23, 1993, the Plaintiff's claim against Karla Love was settled, and Karla Love was dismissed as a party Defendant. The Defendant Bank's counterclaim against Karla Love is reserved by the Bank and Karla Love for determination in another forum.

delivered to FIB a promissory note in the principal amount of $600,000. The promissory note was unsecured and had a maturity date of January 15, 1991. A true and correct copy of the promissory note is admitted as Exhibit 1.

9. The note was not paid at maturity. On February 27, 1991, by which date the loan balance had been reduced to $425,000, JL and KL executed and delivered to FIB a Change in Terms Agreement. By the provisions of that document the maturity of the debt was extended to April 1, 1991. A true and correct copy of the Change In Terms Agreement is admitted as Exhibit 2.

10. Neither JL nor KL paid the note at the time of the extended maturity.

11. On June 28, 1991, FIB, JL and KL executed an Agreement And Release Of All Claims ("the Agreement"). A true and correct copy of the Agreement is admitted as Exhibit 3.

12. The sum of $175,000 was paid on June 28, 1991, by Record Coin Shop/John B. Love, check number 1056, dated June 28, 1991, drawn on account number 069900543 with First Federal Savings Bank of Montana, Cut Bank office, deposited in First Interstate Bank on June 28, 1991. The check cleared the Federal Reserve Bank July 1, 1991. A true and correct copy of the June 28, 1991 check is admitted as Exhibit 4.

13. The sum of $150,000 was paid by Karla Love on or about July 26, 1991, by check number 2841 drawn on the account of Karla Kay Love with the First State Bank of Shelby, account number 54 8300. A true and correct copy of the check is admitted as Exhibit 5.

14. The Agreement and the payments made to FIB under it occurred within 90 days of the date of filing the petition for relief and during the period when the Debtor was presumed to be insolvent.

15. On May 14, 1991, JL borrowed $100,000 from Par Oil Company ("Par Oil"). The obligation is represented by a promissory note of that date, a true and correct copy of which is admitted as Exhibit 6. KL is named as a borrower on Exhibit 6, but only JL executed the note.

16. The Par Oil note was secured by a second mortgage on the residence of JL and KL, as well as a security interest in certain personal property of JL, consisting of motor vehicles. The mortgage was also dated and executed May 14, 1991. It was recorded May 20, 1991, in the office of the Glacier County Clerk and Recorder. A true and correct copy of the mortgage is admitted as Exhibit 7.

17. On May 14, 1991, JL executed and delivered to Par Oil a security agreement granting Par Oil a security interest in a 1986 Chriscraft Inboard boat, a 1988 Cadillac Eldorado, a 1989 Ford Bronco and a 1989 Chevrolet Suburban. A true and correct copy of the security agreement is admitted as Exhibit 8.

18. On May 24, 1991, the lien of Par Oil was noted on the records of the Motor Vehicle Division of the State of Montana as to the Cadillac, the boat and the Suburban, and on June 7, 1991, as to the Bronco. True and correct copies of the Notices of Lien Filing are admitted as Exhibits 9, 10, 11 and 12.

19. In the Debtor's bankruptcy proceedings and in connection with the transaction with FIB, JL did not claim as exempt any portion of his life insurance which had a cash surrender value.

20. On or about July 25, 1991, KL received a money order from Christie's auction of $190,000. The funds represented the proceeds from the sale of a ring.

21. The Par Oil check to John Love was dated May 14, 1991, and was deposited to his Record Coin Shop account with First Federal Savings Bank on June 28, 1991. The proceeds of insurance were deposited to the Record Coin Shop account on June 20, 1991, in deposits of $17,750, and $5,993.46. True and correct copies of the deposit tickets to the account are admitted as Exhibit 13. True and correct copies of the Statement Summary for the Record Coin Shop/John B. Love account at First Federal Savings Bank for the months May, June and July 1991, are admitted as Exhibits 14, 15 and 16.

22. The files of First Interstate contain no reference to a Par Oil Company loan to John Love as part of his settlement with the Bank.

23. First Interstate did not know the source of the funds represented by the $175,000 payment.

24. First Interstate has no correspondence with and did not communicate with Par Oil about a loan or possible loan to John Love.

Additional trial Exhibits admitted into evidence show that as of July 1, 1991, the Debtor had scheduled assets of $1,661,940 against liabilities of $4,057,007. FIB's debt is not scheduled as a liability and a number of obligations are listed as disputed. A bank official noted that "Love is slightly under water even ignoring the disputed debts." The Agreement and Release of All Claims between the Debtor, Karla Love and the Bank was fully satisfied by timely payments to the Bank of $325,000 in full satisfaction of the outstanding Bank debt of over $438,000, which debt was totally unsecured.

The promissory note signed by the Debtor in favor of Par Oil for $100,000 bears a maturity date of May 14, 1996, and contains no other terms and conditions except the interest rate and that the note is secured by a real estate mortgage and security on vehicles. The president of Par Oil testified over objection by the Plaintiff that Par Oil loaned the funds to the Debtor in order to allow the Debtor to pay the proceeds to the Bank. Under these facts, the Bank contends the "earmarking" doctrine provides a defense against the preference claim. The president also stated that the collateral given to secure the Par Oil note was not valued at the time of the transaction. However, the title registration lien filing for each vehicle shows the lien value at $20,000 on each of the four notices of lien filing. In addition, the Debtor's one-half interest in the family residence, according to the post-trial memorandum of FIB, based on the Debtor's bankruptcy Schedules, shows equity by the Debtor of about $30,000. Contrary to FIB's statement, the Debtor's homestead exemption has no effect on the mortgage interest by reason of Mont.Code Ann. Section 70–32–202(3). These values would indicate the Par Oil note was fully secured at the date of the loan.

■ One of the powers of a Chapter 11 Debtor is the authority under 11 U.S.C. § 547(b) to avoid certain payments made by the Debtor that would enable a creditor to receive payment of a greater percentage of his claim against the Debtor than would have been received if the transfer had not been made and he had participated in the distribution of the assets of the bankruptcy estate under the Bankruptcy Code. In recovering a voidable preference, a Chapter 11 debtor as the bankruptcy trustee, 11 U.S.C. § 1107(a), advances the policy favoring equality of distribution among similarly situated creditors of the estate. *Begier v. Internal Revenue Service*, 496 U.S. 53, 58, 110 S.Ct. 2258, 2262, 110 L.Ed.2d 46 (1990). Voidable preferences are brought into the estate and thus made available for pro rata distribution among creditors of equal priority.

■ Section 547(b) permits a Chapter 11 debtor as the trustee to avoid any transfer of an interest in the debtor's property made within 90 days of the filing of the bankruptcy petition where the transfer is to or for the benefit of a creditor, is for or on account of an antecedent debt, is made while the debtor is insolvent, and enables the creditor to receive more than such creditor would receive in a Chapter 7 liquidation under the Code. *In re Bullion Reserve of North America*, 836 F.2d 1214, 1216–17 (9th Cir.1988). The relevant inquiry is whether FIB would receive more under the distributive provision of the Code than it would receive absent any transfer. *In re Mantelli*, 149 B.R. 154, 157 (9th Cir. BAP 1993). *Bullion* further holds:

The term "property of the debtor" is not defined in the Bankruptcy Code. However, we define the term broadly (citing case). Generally, property belongs to the Debtor for purposes of §. 547 if its transfer will deprive the bankruptcy estate of something which would otherwise

be used to satisfy the claims of creditors. *Id.* at 1217.

Since the term "property of the debtor" is undefined, courts look to state law to determine whether property is an asset of the debtor. *In re Brass Kettle Restaurant, Inc.,* 790 F.2d 574, 575 (7th Cir.1986); *In re Sierra Steel, Inc.,* 96 B.R. 271, 273 (9th Cir.BAP 1989). This brings us to one of the central issues in this case raised by FIB as a defense, namely, the "earmarking" doctrine.

 The "earmarking" defense is an exception to what would otherwise be a voidable transfer and therefore property of the Debtor's estate. The doctrine provides that if property transferred in payment of a debt was never truly within the control of the debtor or subject to the debtor's direction, then a transfer of such property would not be a preference as such assets are not considered property of the estate under § 541 of the Bankruptcy Code. *Official Bondholders' Committee v. Eastern Utilities Associates (In re EUA Power Corporation),* 147 B.R. 634, 640 (Bankr. D.N.H.1992); *In re Sierra Steel, Inc.,* 96 B.R. at 274; *In re Ludford Fruit Products, Inc.,* 99 B.R. 18, 21 (Bankr.C.D.Cal. 1989). The earmarking doctrine developed under the 1898 Bankruptcy Act (Act). The doctrine arose to protect third parties, including guarantors and co-makers, who were co-liable for the amount the debtor owed a former creditor. *National Bank of Newport v. National Herkimer County Bank,* 225 U.S. 178, 185, 32 S.Ct. 633, 635, 56 L.Ed 1042 (1912), where the court held that when a guarantor pays a debtor's obligation directly, the transfer does not involve a transfer of the debtor's property, and therefore does not diminish the debtor's estate. Thus, as stated in *Coral Petroleum Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1356 (5th Cir.1986), if "all that occurs in a 'transfer' is the substitution of one creditor for another, no preference is created because the debtor has not transferred property of his estate; he still

owes the same sum to a creditor, only the identity of the creditor has changed." Other circuits and bankruptcy courts have acceded to the same policy. *Matter of Smith,* 966 F.2d 1527, 1533 (7th Cir.1992) *cert. dismissed,* —— U.S. ——, 113 S.Ct. 683, 121 L.Ed.2d 604, 121 L.Ed.2d 604 (1992); *In re Bohlen Enterprises,* 859 F.2d 561, 564–566 (8th Cir.1988); *In re Interior Wood Products Company,* 986 F.2d 228 (8th Cir.1993); *In re Maxwell Newspapers, Inc.,* 151 B.R. 63, 70 (Bankr.S.D.N.Y.1993); *In re Blackoaks, Inc.,* 137 B.R. 251, 253 (Bankr.N.D.Ohio 1992); *New York City Shoes, Inc. v. Best Shoe Corp.,* 106 B.R. 58, 60–61 (E.D.Pa.1989). It has also been recently concluded that the earmarking doctrine survived the 1978 Bankruptcy Code so that the defense is a viable one under the Code. *In re Kelton Motors, Inc.,* 153 B.R. 417, 427 (Bankr.Vt.1993). The dispositive question is whether the Debtor had direct control of the funds. *Maxwell Newspapers, Inc.,* supra at 70. Thus, if the Debtor had little or no control over the use of the funds or if the transaction involves a complete substitution of a new creditor for a former creditor, the defense is valid. Conversely, if the Debtor maintains some meaningful control over the funds or actual control over the new creditor's funds, then earmarking is not a defense and the funds become property of the estate. *In re New York City Shoes, Inc.,* 98 B.R. 725, 729 (Bankr.E.D.Pa.1989). *In re Knapp,* 119 B.R. 285, 287 (Bankr. M.D.Fla.1990) states:

"[I]f the debtor determines the disposition of the funds from the third party and designates the creditor to be paid, the funds are available for payment to creditors in general and the funds are assets of the estate." [citations omitted].

Moreover, one bankruptcy court in the Ninth Circuit, noting no controlling authority in this circuit on the earmarking doctrine,[2] and citing *In re Bohlen,* supra, held

**2.** Debtor's trial memorandum attached an unpublished case of *In re Seaway Express Corporation,* 940 F.2d 669 (Table) (9th Cir.1990) in rejection of the earmarking doctrine under the facts

of that case. *Seaway* cites *Coral Petroleum, Inc. v. Banque Paribas–London,* supra, and *In re Bohlen,* supra. However, under Ninth Circuit Rule 36–3, the unpublished decision of *Seaway*

in *In re Ludford Fruit Products*, 99 B.R. at 21:

> Courts have since extended the doctrine to include situations in which a third party lends money to the debtor for the agreed purpose of satisfying a specific existing claim of the debtor.

I join with the *Bohlen* court in questioning this expansion of the earmarking doctrine beyond its original application. When a guarantor pays a primary obligation with the guarantor's own funds, common sense dictates that no property of the debtor is transferred. Common sense is stretched to the breaking point when a court finds that the funds loaned to a debtor, even for the specific purpose of paying an existing creditor, do not become property of the estate.

■ In this regard, the Plaintiff has raised an issue as to the testimony of the president of Par Oil that the loan of its funds to the Debtor was for the specific purpose of paying on the FIB note. The testimony was admissible because it did not alter or vary the written Par Oil note and mortgage between the parties. The contents are unaltered. *See, Perez–Lizano v. Ayers*, 215 Mont. 95, 695 P.2d 467, 470 (1985), where the court held the parole evidence rule in Mont.Code Ann. § 28–2–905 excludes evidence which varies the terms of the written note. Here, the evidence was admitted under FIB's theory that the Debtor's disposition of the loan funds from Par Oil supports the application of the earmarking doctrine. The Eighth Circuit Court of Appeals in *In re Bohlen*, 859 F.2d at 566, states such oral agreement, as a prerequisite to sustain the earmarking doctrine, must be an agreement between the new creditor (Par Oil) and the debtor to pay the specific antecedent debt (FIB), and the transaction must then be performed pursuant to that agreement. Support for this limitation on the earmarking doctrine is also found in *In re Kumar Bavishi & Associates*, 906 F.2d 942, 944 (3rd Cir. 1990). By reason of the Agreed Statement of Facts, FIB's evidence is admissible to support this specific limitation of the earmarking doctrine because, if the testimony is accepted as true, the agreement was with the new creditor, Par Oil, thus satisfying this element of the earmarking doctrine.

■ Another limitation on the application of the earmarking doctrine involves precisely the facts of this case, namely, Par Oil's taking of a security interest in assets of the Debtor under a situation where FIB was an unsecured creditor. The courts have unanimously held that when a debtor grants a security interest in its property in exchange for a loan to pay an unsecured debt, the earmarking defense fails. *In re Royal Golf Products Corp.*, 908 F.2d 91, 94 (6th Cir.1990); *In re Muncrief*, 900 F.2d 1220, 1224, n. 4 (8th Cir.1990); *In re Hartley*, 825 F.2d 1067, 1072 (6th Cir.1987); *In re Belme*, 76 B.R. 121, 122 (Bankr.S.D.Ohio 1987); *Matter of Van Huffel Tube Corp.*, 74 B.R. 579, 586 (Bankr.N.D.Ohio 1987). In such case, *Royal Golf Products Corp.*, 908 F.2d at 94, holds the trustee may avoid the transfer because the security interest diminishes the property of the estate, but "only to the extent of the actual value of the collateral given by the debtor to secure the loan." In this case, I find from the exhibits and Debtor's Schedules that the amount of security taken by Par Oil at the time of transfer of the loan funds was equal to the amount of the loan of $100,-000, and therefore diminished the Debtor's estate by that sum. The voidable preference is thus equal to amount of the Par Oil loan.

■ I also conclude from the facts that the earmarking doctrine is not a defense to FIB because the Par Oil funds were deposited, unrestricted, into the Debtor's general operating account, whereby the Debtor had sole control to use the loan funds as Debtor saw fit. Par Oil did not place FIB on its check, nor did Par Oil make payment directly to FIB. Rather, the Debtor received the funds without limitation, commingled

cannot be used as precedent and should not be cited except when relevant under the doctrines of law of the case, *res judicata* or collateral

estoppel. *Seaway* is thus not precedence on the earmarking doctrine.

the funds in the Debtor's bank account with other business receipts and then wrote a $175,000 check, rather than a $100,000 check. The Debtor thus controlled their disposition. The essential overriding element of control under the earmarking doctrine is missing because the Debtor had absolute control over the Par Oil loan proceeds. *See, In re Ludford Fruit Products, Inc.*, supra. The earmarking defense thus fails.

■■■■ As to the preference elements, I find a transfer of $175,000 was made to FIB, an unsecured creditor, within 90 days of the bankruptcy petition on account of an antecedent debt due FIB in the amount exceeding $425,000. On the issue of insolvency, the agreed facts concede the Debtor is presumed insolvent, as this is the statutory criteria under § 547(f). The transferee, FIB, must overcome the presumption. *Sanyo Elec., Inc. v. Taxel (In re World Financial Serv. Center, Inc.)*, 78 B.R. 239, 241 (9th Cir.BAP 1987). In addition to the presumption, however, the Debtor's Exhibit B of schedule of assets and liabilities on July 1, 1991, within 2 days of the date of the transfer, is the only evidence sustaining the "balance sheet" test required to prove insolvency. *In re Koubourlis*, 869 F.2d 1319, 1322 (9th Cir.1989). FIB introduced no "balance sheet" evidence. On these bases, the element of insolvency has been proven.

■■■■ The final element is whether FIB received more from the $175,000 transfer than it would have received if the transfer had not been made, and the case liquidated under Chapter 7. Under the Debtor's confirmed Plan, of which the Court took judicial notice without objection, FIB would be as a general, unsecured creditor in Class XI. *In re Lewis Shurtleff, Inc.*, 778 F.2d 1416, 1421 (9th Cir.1985) explains the "greater amount" test required under 547(b)(5), citing *Palmer Clay Products Co. v. Brown*, 297 U.S. 227, 229, 56 S.Ct. 450, 450, 80 L.Ed. 655 (1936).

This analysis requires that in determining the amount that the transfer "enables [the] creditor to receive", 11 U.S.C. § 547(b)(5) (1982), such creditor must be charged with the value of what was transferred *plus* any additional amount that he would be entitled to receive from a Chapter 7 liquidation. The net result is that, as long as the distribution in bankruptcy is less than one-hundred percent, *any* payment "on account" to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made (citing cases).

Under the liquidating Plan of Reorganization, based on Debtor's Schedules, the net liquidation of assets was fixed at $482,396. Adding in the $175,000 preferential transfer to FIB, the total net liquidating amount would be $657,396. Total scheduled unsecured creditors is $3,899,406. Assuming FIB's claim at $448,665, as testified to by FIB's officer, with no allowance for administrative expenses, FIB would have received $74,086.55 on its unsecured claim in a Chapter 7 liquidation. FIB in fact received $175,000 under the June 28, 1991, transfer. The "greater amount" test is thus clearly established.

■■■■ FIB also asserts as a defense that the payment of $175,000 was made in the ordinary course of business under § 547(c)(2). 4 *Collier on Bankruptcy*, ¶ 547.10, pp 547–48 and 49 (15th Ed.) explains the ordinary course of business exception to the preference rule.

"This section is intended to protect recurring customary credit transactions that are incurred and paid in the ordinary course of business of the debtor and the debtor's transferee."

However, in *Union Bank v. Wolas*, 502 U.S. ——, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991), the U.S. Supreme Court resolved a split between circuits holding "that payments on long-term debt, as well as payments on short-term debt, may qualify for the ordinary course of business exception to the trustee's power to avoid preferential transfers." *Id.*, at ——, 112 S.Ct. at 533. The debtor in *Wolas*, several months after borrowing $7 million from the bank transferee, filed a Chapter 7 bankruptcy petition. Within the 90–day period before

bankruptcy, the debtor made two interest payments totalling $100,000 and paid a loan commitment fee of about $2,500. The Court remanded without opinion whether the loan involved in *Wolas* was incurred in the ordinary course of each parties' business. *Id.* at ——, 112 S.Ct. at 534. The transferee has the burden of proving the defense under § 547(c)(2). *In re Fred Hawes Organization, Inc.,* 957 F.2d 239, 242, 244 (6th Cir.1992). *Hawes* further holds that in order to successfully establish the defense, the bank must prove, "that the debt and its payments are ordinary in relation to the standard prevailing in the relevant industry." *Id.* at 244. The analysis is fact specific, requiring a determination of the "timing, amount and manner a transaction was paid and the circumstances under which the transfer was made." *Id.* This Court finds FIB has failed in its proof.

John Love was a 20–year customer of FIB and was extended a sizeable line of credit over this period. Such loans to Love were in the ordinary course of business between the parties. The note due October 1, 1991, after being paid down from $600,000 to $425,000 in principal, was extended on two different occasions. An extraordinary settlement was then reached between the parties, whereby the entire obligation of $448,665, principal and interest, would be written down and satisfied for $325,000, with one payment by the Debtor of $175,000, and another payment by the spouse of $150,000. The work-out, for whatever reason, was at FIB's insistence, after the Debtor's request to extend the maturity date was rejected by FIB. FIB had clear knowledge at the work-out time that Love's recent business losses placed the entire unsecured loan in jeopardy. Exhibit 20. Indeed, Exhibit 20 of the Bank lists five non-business sources as possible repayment modes, and the sixth source is to sue a Debtor's employee—hardly an ordinary course of business transaction prevalent in the industry. Further, the FIB president described the 20–year loan period as one where the Debtor would ordinarily have made a lump sum payment annually to satisfy the payment schedule. That entire regular practice was disrupted when the Debtor could not pay due to the Debtor's financial condition, and the Bank agreed in writing to a settlement and release by discount of the note. Finally, the settlement agreement, Exhibit 3, states "John B. Love borrowed certain funds from First Interstate for use in the business of Record Coin Shop" and Karla Love was co-signer. Karla Love was to pay the additional $150,000 in cash before August 10, 1991, to satisfy the release. None of these terms were contained in the promissory notes of February 27, 1991, and October 23, 1990. Such terms were in fact out-of-the-ordinary course of business dealings between the parties. The language from *In re Energy Cooperative., Inc.,* 832 F.2d 997, 1004 (7th Cir.1987), concerning a one-time payment to settle a breach of contract claim, is peculiarly applicable to the instant case.

> Congress enacted § 547(c)(2) "to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or creditors during the debtor's slide into bankruptcy." House Report at 373, 1978 U.S.Code Cong. & Ad.News at 6329; *see also* Senate Report at 88, 1978 U.S.Code Cong. & Ad.News at 5874.

I conclude FIB has failed in its burden to establish the defense under § 547(c)(2), especially where a substantial payment of $150,000 to settle the defaulted note was to come from a non-business source, namely the sale of Karla's ring. The one-time payment on a discounted basis was not in the ordinary course of Debtor's and FIB's business relationship.

Based on the foregoing, the Plaintiff's estate shall recover from the Defendant, FIB, the sum of $175,000 paid as preference under § 547 of the Bankruptcy Code. The debt due FIB must, accordingly, be adjusted since there has been a material default in the terms of the Release Agreement of June 28, 1991. (Exhibit 3). At the date of bankruptcy, FIB would have been owed $448,665, absent the release agreement. After credit of the payment from Karla Love of $150,000, the Bank has a general, unsecured claim against the bank-

ruptcy estate in the amount of $298,665. Accordingly, FIB shall participate in any pro-rata payments to unsecured creditors in that amount.

IT IS ORDERED Judgment shall be entered for the Plaintiff Estate of John B. Love, and against the Defendant, First Interstate Bank of Montana, in the sum of $175,000 pursuant to 11 U.S.C. § 547(b).

IT IS FURTHER ORDERED said Defendant's claim against the estate of John B. Love is fixed in the sum of $298,665 as a general, unsecured claim.