In re ENTRINGER BAKERIES,
INC., Debtor.

Aaron E. Caillouet, Trustee, Plaintiff

v.

First Bank and Trust, Defendant.

Bankruptcy No. 01–14388.
Adversary No. 03–1051.

United States Bankruptcy Court,
E.D. Louisiana.

June 14, 2006.

552

Carey L. Menasco, Liskow & Lewis, APLC, New Orleans, LA, Philip Kirkpatrick Jones, Jr., Liskow & Lewis, New Orleans, LA, for defendant.

David J. Messina, Gordon, Arata, McCollan, Duplantis Eagan, New Orleans, LA, Fernand L. Laudumiey, IV, Gordon, Arata, McCollam, Duplantis, New Orleans, LA, for plaintiff.

John M. Landis, Michael Q. Walshe, Jr., New Orleans, LA, for debtor.

Alicia M. Bendana, Mark S. Goldstein, David J. Messina, Gordon, Arata, McCollan, Duplantis Eagan, New Orleans, LA, Fernand L. Laudumiey, IV, Gordon, Arata, McCollam, Duplantis, New Orleans, LA, for trustee.

### REASONS FOR DECISION

GERALD H. SCHIFF, Bankruptcy Judge.

Entringer Bakeries, Inc. ("Debtor"), filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code[1] on May 29, 2001 ("Petition Date"), and on that day an order for relief was duly entered. The case was subsequently converted to a case under Chapter 7. Aaron E. Caillouet is the duly appointed, qualified and acting trustee.

Plaintiff filed a Complaint to Avoid Transfers[2] on February 26, 2003. The Complaint asserted two separate causes of action against First Bank and Trust. The first cause of action sought to avoid transfers totaling $10,989.94 pursuant to section 548(a)(1)(B). In due course a Consent Judgment was entered in favor of the Plaintiff and against the Defendant in that amount. Accordingly, the first cause of action is no longer at issue in this proceeding.

Pursuant to the second cause of action, which is still viable, Plaintiff seeks to avoid alleged preferential transfers to the Defendant totaling $182,905.50, and seeks to recover such amount from the Defendant as an initial transferee under section 550.

The Defendant contends that funds in the amount of $181,702.50 transferred by the Debtor to the Defendant were never property of the Debtor's estate because those funds had been "earmarked" by Whitney National Bank ("Whitney") for payment to the Defendant, and, therefore the transfer was not preferential. The Defendant further contends that even if the transfers are found to have been preferential, they cannot be avoided because they were made in the ordinary course of business pursuant to section 547(c)(2).

### I. Facts[3]

On September 29, 2000, the Debtor borrowed $180,000 from the Defendant as evi-

---

1. Title 11, United States Code. References herein to sections of the Bankruptcy Code are shown as "section."

2. Pleading 1.

3. The facts are taken from the Joint Pre–Trial Stipulation (pl. 65) with only minor modifications.

denced by a promissory note of even date ("the First Note"). The Debtor had no prior lending relationship with the Defendant prior to that date. The loan was in the nature of a bridge loan, that is, both the Debtor and the Defendant contemplated permanent financing to occur prior to the note's maturity. The First Note was unsecured and became due in three months; interest was due monthly.

In furtherance of its desire for permanent financing, the Debtor applied for a loan ("Whitney Loan") from Whitney to be guaranteed ("SBA Guaranty") by the Small Business Administration ("SBA"). The necessary documentation was submitted on November 17, 2000, and, on December 12, 2000, the SBA approved the request that it guarantee the Debtor's obligation under the Whitney Loan.

As the closing of the Whitney Loan could not occur prior to the maturity of the First Note, the Debtor executed a renewal promissory note on January 30, 2001 ("the Second Note"). The Second Note called for one interest payment to be made on March 5, 2001, with the principal and additional accrued interest being due on March 30, 2001.

The SBA Guaranty was conditioned upon satisfactory compliance with the following prior to the funding of the Whitney Loan:

(1) Evidence that the Debtor had received the proceeds of a loan from a private lender in the amount of $500,000.00, for a term of not less than 7 years.

(2) Evidence that the Debtor had received the proceeds of a subordinated loan from RLC/EDA in the amount of $250,000.00 for a term of not less than 7 years.

(3) Evidence that the Debtor had received the proceeds of a subordinated loan from RLC/HUD in the amount of $100,000.00 for a term of not less than 7 years.

(4) Evidence that the Debtor had received the proceeds of a subordinated loan from RLC/NCR in the amount of $50,000.00 for a term of not less than 7 years.

(5) Evidence that the Debtor had received the proceeds of a subordinated loan from SBIDCO in the amount of $100,000.00 for a term of not less than 7 years.

Until such time as these conditions were satisfied, Whitney was not authorized by the SBA to fund the Whitney Loan.

Condition (1) was to be satisfied by the Whitney Loan. Condition (2) was satisfied when funds from Regional Loan Corporation ("RLC") in the aggregate amount of $250,000.00 were disbursed to the Debtor and deposited into the Debtor's Business Checking Account[4] on January 16, 2001. Conditions (3), (4) and (5) were satisfied when funds from the RLC and New Orleans SBIDCO in the aggregate amount of $250,000.00 were disbursed to the Debtor and deposited into the Debtor's Business Checking Account on April 12, 2001.

The Credit Memorandum of Gary Lorio dated November 3, 2000 ("Lorio Memo"), sets forth that Whitney intended that the Debtor's indebtedness to First Bank, along with $525,000.00 of the Debtor's existing unsecured debt to Whitney, would be repaid with the Whitney Loan "proceeds combined with the RLC term loan of $500,000.00."

---

**4.** The Debtor maintained two checking accounts at Whitney, an Operating Account (Account No. 0712869387), and a Business Checking Account (Account No. 0712869468). Neither account was a trust account.

Another condition of the SBA Guaranty was that the Whitney Loan was to be secured by the Debtor's fixtures located at 3847 Desire Parkway, New Orleans, LA 70139, certain machinery and equipment, and the Debtor's leasehold interest.

The one time interest payment of $1,203.00 required by the Second Note was paid by the Debtor to the Defendant by its check number 2920 dated March 6, 2001. That check cleared on March 9, 2001. The check was drawn on the Debtor's Operating Account.

The SBA-guaranteed Whitney Loan closed on April 6, 2001; on April 12, 2001, $900,000.00 was deposited into Debtor's Business Checking Account. On the same day $250,000.00 was deposited into the Debtor's Business Checking Account by RLC. At the time these deposits were made, the Debtor's Business Checking Account had an existing balance of $73,298.82.

During the month of April, 2001, the Business Checking Account reflected deposits and credits in the amount of $1,935,897.82 and checks and debits in the amount of $1,956,714.49.

On April 12, 2001, two "Debit Memos" were entered in the Debtor's Business Checking Account whereby Whitney repaid outstanding unsecured indebtedness owed to it by the Debtor in the total amount of $725,000.00 ($525,000.00 and $200,000.00).

When the Whitney Loan funds were disbursed to the Debtor, the Debtor had complete physical control over the money remaining in the account after repayment by it of the outstanding Whitney unsecured indebtedness, namely, $725,000.00. Also, once the money was loaned to the Debtor, Whitney considered the Whitney Loan proceeds to be property of the Debtor.

In making the Whitney Loan to the Debtor, Whitney did not obtain an assignment of the Defendant's claims against the Debtor nor did Whitney substitute itself in the place of the Defendant.

By check number 1404 out of the Business Checking Account, dated April 13, 2001, the Debtor paid the Defendant $181,702.50, representing the principal and accrued interest on the Second Note, and charges owed on the Second Note. Check 1404 cleared on April 16, 2001. Both the First Note and the Second Note bear stamps stating "PAID April 17, 2001."

## II. Law and Analysis

Pursuant to section 547(b), a trustee may avoid certain transfers of a debtor's interest in property:

(b) [T]he trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The following transfers ("the Transfers") from the Debtor to the Defendant are made the subject of remaining count of the Complaint: (1) check number 2920 dated March 6, 2001, in the amount of $1,203.00, and (2) check number 1404 dated April 13, 2001, in the amount of $181,702.50.

While the Defendant contends that the Transfers did not involve "transfers of an interest of the debtor in property," the parties have stipulated that all other requirements of section (b)(1)-(5) have been satisfied:

● The Transfers were made directly to the Defendant and for the benefit of the Defendant, a creditor of the Debtor. Section 541(b)(1).

● The Transfers were for or on account of an antecedent debt owed by the Debtor to the Defendant before the Transfers were made. Section 541(b)(2).

● The Debtor was insolvent[5] at the time the Transfers were made. Section 541(b)(3).

● The Transfers were made within 90 days of the Petition Date. Section 541(b)(4)(A).

● The Transfers enabled the Defendant to receive more than the Defendant would have received if the Transfers had not been made and the Defendant received payment of the debts to the extent provided by Chapter 7 of the Bankruptcy Code. Section 541(b)(5).

As stated above, however, the Defendant takes the position that the Transfers did not involve property in which the Debtor had an interest, and, therefore, section

541(b) cannot be the basis for avoidance. This is the court's first inquiry.

## A.

## WAS THERE A TRANSFER OF AN INTEREST OF THE DEBTOR IN PROPERTY?

As a threshold prerequisite, section 547(b) provides that for a transfer to be considered preferential, the transfer must have been a "transfer of an interest of the debtor in property." The Defendant contends that the funds in the amount of $181,702.50 transferred by the Debtor to the Defendant were never property of the Debtor's estate because those funds had been "earmarked" by Whitney for payment to the Defendant.

■ A leading treatise contains the following discussion regarding the earmarking doctrine:

> Under the "earmarking doctrine," funds provided to a debtor for the purpose of paying a specific indebtedness may not be recoverable as a preference from the creditor to which they are paid, on the premise that the property "transferred" in such a situation was never property of the debtor and so the transfer did not disadvantage other creditors. One creditor has been substituted for another thus, when new funds are provided by the new creditor to or for the benefit of the debtor for the purpose of paying the obligation owed to the old creditor, the funds are said to be "earmarked" and the payment is held not to be a voidable preference. [Footnote omitted.]

5 COLLIER ON BANKRUPTCY ¶ 547.03[2] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev), p. 547–24. The case cited by Collier in support of the earmarking doctrine, *McCuskey v. National Bank of Wa-*

5. Section 101(32).

*terloo,* 859 F.2d 561 (8th Cir.1988), employed a three-part test to determine whether the doctrine applied: (1) the existence of an agreement between the new lender and the debtor that the new funds will be used to pay a specific antecedent debt; (2) performance of that agreement according to its terms; and (3) the transaction viewed as a whole did not result in any diminution of the estate.

■ Cases involving the earmarking doctrine have arisen in the Fifth Circuit. In *Coral Petroleum v. Banque Paribas–London,* 797 F.2d 1351, 1358 (5th Cir. 1986), the court considered a key issue to be whether the Debtor had unfettered control of the new funds.

In the instant case, the parties have stipulated that the Debtor had complete physical control over the money remaining in the account after Whitney repaid outstanding unsecured indebtedness owed to it by the Debtor in the total amount of $725,000.00. The parties have also stipulated that once the money was loaned to the Debtor, Whitney considered the Whitney Loan proceeds to be property of the Debtor.

■ The *Coral* court, however, recognized that control by the debtor does not *ipso facto* defeat the application of the earmarking doctrine:

> Where the debtor physically receives control of the funds, there can still be an "earmark," *see* 4 *Collier, supra,* ¶ 547.25, but the debtor's lack of dispositive control must be proven. Demonstrating the*third party's-intent* [6] is one way of doing this, but [the Fifth Circuit does] not believe it is the exclusive method,

especially if there is adequate proof of the lack of control by a debtor.

*Id.* at 1361. (emphasis added)

The Fifth Circuit has also recognized that the earmarking doctrine is dependent upon a diminution of the debtor's estate, stating, in the case of *In re Southmark Corp.,* 49 F.3d 1111, 1117 (5th Cir.1995),:

> [T]he primary consideration in determining if funds are property of the debtor's estate is whether the payment of those funds diminished the resources from which the debtor's creditors could have sought payment.

The "Transaction Request" of the November 3, 2000, Credit Memorandum of Gary Lorio, a Senior Vice–President at Whitney, to Whitney's Senior Loan Committee states,

> The term loan proceeds combined with the RLC term loan of $500M will be used to repay existing Whitney unsecured debt of $525M and a $180M loan from First Bank.[7]

Mr. Lorio testified in his deposition taken on July 7, 2005, that he told Mr. Ballero, an employee of the Defendant, that the First Note would be paid when the Whitney Loan was funded.

> Q. Did you communicate with Mr. Ballero or anyone at First Bank after the approval by the SBA on December 12th?
>
> A. I don't remember.
>
> Q. Do you recall whether or not you called Mr. Ballero and told him that the loan, that the SBA had been approved, but it would take a while to actually close the loan?
>
> A. I'm sure I did, but I don't recall a specific conversation.

---

**6.** *See also In re Hartley,* 825 F.2d 1067, 1071–1072 (6th Cir.1987) ("The earmark rule requires that the party making the loan choose the recipient of the funds.")

**7.** Joint Exhibit 17.

Q. Do you recall him telling you that the loan would be maturing and needed to be renewed?

A. I do not remember that, although I know he was looking for the loan to be paid.

Q. Did you tell him that the loan would be paid when the loan was funded?

A. Yes, that would be the intent.[8]

When asked whether Whitney placed any restrictions on the funds other than the amount debited to pay Whitney, Mr. Lorio replied:

No. But it was our discussion with the borrower, the borrower is Mr. Leunissen and First Bank, that they would use those portions of the proceeds or that difference to pay off the loan at First Bank. I'm just telling you what our intent was and what our discussions were.[9]

Yet another example of the intent of Whitney that the funds be earmarked to pay the loan to First Bank is the following exchange:

Q. Is there any reason why the Whitney did not make the disbursement directly to First Bank from the funding as opposed to placing the money into the account of Entringer?

A. No specific reason. Sometime we do and sometimes we don't. But I had discussions with Mr. Leunissen, Mr. Ebrahim regarding paying off First Bank and had talked to, I believe, Mr. Ballero at First Bank, so we all understand that's what would happen.

Q. That would happen. Whitney agreed to put it into the account with the–

A. With the understanding that the proceeds would be used to pay off First Bank.[10]

■ The court holds that the first two elements of the three-prong test set forth in *McCuskey, supra,* have been satisfied. Specifically, (1) there existed an agreement between the Whitney and the Debtor that the new funds will be used to pay the First Bank debt, and (2) the new funds were actually used for that purpose. While there is no doubt that the Debtor had physical control of the proceeds of the Whitney Loan, the Court concludes that it was the intent of Whitney that the funds be "earmarked" for payment of the Second Note.

■ The third element is that there be no diminution of the Debtor's estate as a result of the transaction. Notwithstanding a determination that the funds were earmarked, a payment by a debtor with such funds to an unsecured creditor may still be avoidable as a preference to the extent of the value of the collateral given to the new lender if the debtor is required to grant a security interest to the new lender. 5 COLLIER ON BANKRUPTCY ¶ 547.03[2] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev), p. 547–29. *See, also, In re Superior Stamp & Coin Co.,* 223 F.3d 1004, 1009 n. 3 (9th Cir.2000) ("In such situations, an unsecured creditor is replaced with a secured creditor, thus diminishing the amount available in bankruptcy for creditors of the same class."), and *In re Hartley,* 825 F.2d 1067, 1071 (6th Cir.1987) ("Even where the debtor transfers a security interest in return for the loan, the payment is only a voidable preference to the extent the transaction depleted the debtor's estate.")

8. Joint Exhibit 39, p. 34, lines 2–19.

9. Joint Exhibit 39, p. 58, lines 10–16.

10. Joint Exhibit 39, p. 49, lines 1–15.

Since the satisfaction of the Second Note resulted in an unsecured note being paid by a new loan for which security was given, the earmarking doctrine will not insulate the transfer to the extent of the value of the security interest. The Whitney Loan was secured by fixtures located on the property located at 3847 Desire Parkway, New Orleans, LA 70139, certain machinery and equipment, and a leasehold interest.[11] There exists substantial dispute over the value of that security interest.

The machinery and equipment securing the Whitney Loan were appraised by Shannon Mullinax of American Appraisal Associates, Inc., whose Appraisal Report was dated February 15, 2001. The appraisal, as of January 24, 2001, estimates the "fair market value for continued use" in the amount of $828,000, and "fair market value for orderly liquidation" in the amount of $307,000.00.[12]

Timothy Lee Mutz, president of Servcorp International, Inc., the company that auctioned the Debtor's equipment testified that these appraisals should not apply because the machinery and equipment were auctioned on November 15, 2001, and January 17, 2002, in a forced, rather than an orderly, liquidation. As a result, the Defendant contends that the value of the collateral was only $74,381.04, the net proceeds of the sale.[13]

■ The Court must use the value of the collateral on the date of the transfer, April 13, 2001. *See In re Love,* 155 B.R. 225, 229 and 231 (Bkrtcy.D.Mont.1993).

■ A liquidation analysis is used to determine "fair valuation" of assets where the debtor is "financially dead or mortally wounded." *E.g., Langham, Langston & Burnett v. Blanchard,* 246 F.2d 529, 532–33 (5th Cir.1957). Liquidation or scrap value of assets must be used because, if the entity is not a going concern at the time of the transfer, "it would not be proper for the assets to be valued at a going concern value." *Id.* (citation omitted); *Mitchell v. Investment Secs. Corp.,* 67 F.2d 669, 671 (5th Cir.1933) (stating that use of scrap or junk values is proper if the debtor, though nominally alive, is really dead on its feet on the date of the transfer).

■ If bankruptcy was not clearly imminent on the date of the challenged transfer, the court must achieve a "fair valuation" of the debtor's assets on a "going concern" basis. *In re Trans World Airlines, Inc.,* 134 F.3d 188 (3rd Cir.1998); see also *WCC Holding Corp. v. Texas Commerce Bank–Houston,* 171 B.R. 972, 984 (Bankr.N.D.Tex.1994) (*citing Moody v. Security Pac. Business Credit Inc.,* 971 F.2d 1056, 1067 (3rd Cir.1992)).

Marc Leunissen, a partial owner of the Debtor at the time of the transfer, testified in his July 19, 2002, deposition that at the time the Whitney Loan was made, the Debtor was "[l]imping along, but operating."[14] He also testified that at the time of the transfer,

It was a month-to-month struggle trying to repay the debt. We were—We had a cash crisis monthly and every payroll was critical.[15]

---

**11.** Joint Pre-trial Stipulation, p. 7.

**12.** *Joint Pre-trial Stipulation, p. 7 and Joint Exhibit 18.*

**13.** $70,649.60 from the November 15, 2001 auction; $931.44 from the January 17, 2002

auction; and $2,800.00 from the sale of the leasehold interest

**14.** Joint Exhibit 38, p. 35, line 2.

**15.** *Id.* at p. 35, lines 19–22.

■ Roughly six weeks after the date of the transfer, on May 29, 2001, the Debtor filed for relief under Chapter 11, and on July 25, 2001, the Debtor converted to a case under Chapter 7. Mr. Leunissen testified at his deposition that the Debtor was initially going to file under Chapter 7, but changed its mind in hopes that a "white knight" would save the company.[16] When that did not happen, the Debtor converted to Chapter 7.[17] Accordingly, the Court finds that the Debtor was "financially dead or mortally wounded"[18] at the time of the transfer, so the proper valuation of the collateral is a liquidation or scrap value.[19]

Thus, the court concludes that as a result of the Transfers, the estate was diminished by the net proceeds of the sale, $74,381.04. Unless the Defendant's reliance upon the ordinary course of business defense is well-founded, that is the amount the Trustee may recover.

## B.

## ORDINARY COURSE OF BUSINESS DEFENSE

While the Defendant admits that the Transfers satisfy the elements of section 541(b), it vigorously argues that neither is avoidable as each was made in the "ordinary course of business," within the meaning of section 547(c)(2). That section provides that the trustee may not avoid a transfer to the extent that it was—

(A) in the payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

■ "A creditor asserting an ordinary course of business defenses must prove all three statutory elements by a preponderance of the evidence." *Leidenheimer Baking Co. v. Sharp (In re SGSM Acquisition Co., LLC)*, 439 F.3d 233, 239(5th Cir.2006), *citing Gulf City Seafoods, Inc. v. Ludwig Shrimp Co. (In re Gulf City Seafoods)*, 296 F.3d 363, 367 (5th Cir.2002).

> In sum, the creditor must show that as between it and the debtor, the debt was both incurred and paid in the ordinary course of their business dealings *and* that the transfer of the debtor's funds to the creditor was made in an arrangement that conforms with ordinary business terms-a determination that turns the focus away from the parties to the practices followed in the industry.

*Gulf City Seafoods*, 296 F.3d at 367. Further, in the case of *In re Intrastate Elec. Services, Inc.*, 2000 WL 1346696, *2 (Bkrtcy.N.D.Ill.), the court observed:

> Many decisions describe these requirements as comprising a two-pronged test that includes a *subjective* inquiry under § 547(c)(2)(A)-(B) as to whether the transaction was ordinary as between the parties, and an *objective* inquiry under § 547(c)(2)(C) as to whether the transaction was ordinary in the industry examined as a whole. (Citations omitted.) (Emphasis added.)

The initial inquiry, therefore, is whether the Transfers were in payment of a debt,

---

16. *Id.* at p. 38 and 39.

17. *Id.*

18. *Langham, Langston & Burnett v. Blanchard,* 246 F.2d at 532–33.

19. The Court also notes that the parties have stipulated that the Debtor was insolvent on the date of the transfer. Joint Pretrial Stipulation, p. 4.

the Second Note, incurred by the Debtor in the ordinary course of the business or financial affairs of the Debtor and the First Bank.

The Trustee argues that the debt was not incurred in the ordinary course of business of the Debtor because it was an emergency, short-term loan. The Trustee relies upon the testimony of an employee of the Defendant, Louis Ballero, who testified that the First Note was intended to be a loan of only a three months because the Debtor anticipated that it would have completed an SBA loan by the end that time.

■ The parties have stipulated that the First Note was the first transaction between the Debtor and First Bank. Cases hold, however, that a transaction can be in the ordinary course of financial affairs even if it is an isolated, single transaction between the parties. *See e.g., In re Wallace's Bookstores, Inc.,* 316 B.R. 254, 264 (Bkrtcy.E.D.Ky.2004). With respect to this discrete issue, Collier opines:

> If the debt was incurred in the routine operation of the debtor and the creditor, then it can be said to have been incurred in the ordinary course of each party's business. Provided that these criteria are met, either long-term or first-time debt can be debt incurred in the ordinary course of business.

5 COLLIER ON BANKRUPTCY ¶ 547.04[2][a][ii][A] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev), p. 547–59.

The Fifth Circuit has declared that the first prong of the ordinary course of business defense is a subjective test. *Oakridge Consulting, Inc. v. J & A Snack Foods, Inc.,* 2004 WL 1900513, *3 (E.D.La. Aug. 20, 2004) ("The creditor ... must prove by a preponderance of the evidence: (1) that as between it and the debtor ..., the debt was incurred in the ordinary course of their business dealings; ...");

*Gulf City Seafoods,* 296 F.3d at 368, fn. 4 ("[T]hese payments were 'ordinary' as between Gulf City and Ludwig and therefore satisfied the first two prongs ...").

Based upon the foregoing, the Court must first determine whether the debt was incurred in the ordinary course of the business dealings between the Debtor and the Defendant.

The parties stipulated that the Defendant had no lending relationship with the Debtor prior to the First Note. The Defendant offered no evidence to show that this type of loan was ordinarily made by the Debtor with any bank.

In the case of *In re Bourgeois,* 58 B.R. 657, 659 (Bankr.W.D.La.1986), Judge Bernard observed:

> The legislative history of section 547(c)(2) states that "[t]he purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." House Report 95–595, 95th Congress, 1st Session (1977), U.S.Code & Admin. News 1978, pp. 5787, 6329. Thus, payments made by a debtor to employees, suppliers, for utilities and rent, and other similar operating expenses or trade credit transactions, were intended by Congress to be exempt from recovery as preferences. (Citations omitted.)

In cases where short-term, emergency loans were found to be in the ordinary course of business, it was common for the creditor to make such loans to the debtor. *Waldschmidt v. Ranier (In re Fulghum Const. Corp.),* 872 F.2d 739 (6th Cir.1989); *Redmond v. Ellis County Abstract & Title Co. (In re Liberty Livestock Co.),* 198 B.R. 365 (Bankr.D.Kan.1996). Other courts

have held that one-time short-term loans, such as the loan at issue, are not in the ordinary course of business between the parties. *Pioneer Technology, Inc. v. Eastwood (In re Pioneer Technology, Inc.)*, 107 B.R. 698 (9th Cir.BAP1988); *Markham v. Lerner (In re Diagnostic Instrument Group, Inc.)*, 283 B.R. 87 (Bankr.M.D.Fla. 2002).

 In examining the circumstances surrounding the First Note, the following facts lead to the inescapable conclusion that this transaction was not within the ordinary course of business of *either* the Debtor or First Bank:

• The First Note was an emergency loan necessary to make payroll and to prevent lessors from commencing eviction proceedings.

• Repayment of the First Note was clearly not contingent upon earnings from operations as the Debtor did not have positive cash flow at the time; the only rational expectation was that the First Note was to be repaid only by through closing of the SBA guaranteed Whitney Loan.

• The First Note was made at a below-prime rate to an undercapitalized entity with little or no cash flow, clearly contrary to the Defendant's loan policy.

• The Defendant received no collateral for the loan, although there was an intent to take a security interest in Mr. Leunissen's brokerage account. This intent failed as the account was already subject to a prior security interest and the first lienor would not consent to a second position.

Accordingly, the Court finds that the transfers that the Trustee seeks to avoid were not made "in the payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee." Section 547(c)(2)(A).

Because the three requirements in section 547(c)(2) are conjunctive, and because the Defendant has failed to meet its burden of proof under section 547(c)(2)(A), the Court finds it unnecessary to reach the second and third requirements.

## III. Conclusion

The Court finds that the transfers made by the Debtor to the Defendant on March 6, 2001, in the amount of $1,203.00, and on April 13, 2001, in the amount of $181,702.50, can be avoided by the Trustee as being preferential pursuant to section 547(b) only in the amount of $74,381.04; further, as the Defendant was an initial transferee, the amount of $74,381.04 can be recovered by the Trustee from the Defendant pursuant to section 550(a). The Court will enter an appropriate order.